586 A.2d 887

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Louis R. EDMUNDS, Appellant.**

Supreme Court of Pennsylvania.

Submitted March 6, 1990.

Decided Feb. 4, 1991.

Kenneth B. Burkley, Greensburg, for appellant.

Jeffrey P. Shender, Defender Ass'n of Philadelphia, Theodore Simon, American Civil Liberties Union, Philadelphia, for amici curiae.

John J. Driscoll, Dist. Atty., William C. Gallishen, Asst. Dist. Atty., Greensburg, for appellee.

Catherine Marshall, Ronald Eisenberg, Office of the District Attorney of Philadelphia County, Philadelphia, for amicus curiae.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

CAPPY, Justice.

### I. HISTORY OF THE CASE

The issue presented to this court is whether Pennsylvania should adopt the "good faith" exception to the exclusionary rule as articulated by the United States Supreme Court in the case of *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). We conclude that a "good faith" exception to the exclusionary rule would frustrate the guarantees embodied in Article I, Section 8, of the Pennsylvania Constitution. Accordingly, the decision of the Superior Court is reversed.

The defendant in the instant case was found guilty after a non-jury trial on August 18, 1987 of criminal conspiracy, 18 Pa.C.S. Section 903(a)(1), simple possession, possession with intent to deliver, possession with intent to manufacture and manufacture of a controlled substance, in violation of the Controlled Substance, Drug, Device and Cosmetic Act, 35 P.S. § 780–101 *et seq.* The conviction was premised upon the admission into evidence of marijuana seized at the defendant's property pursuant to a search warrant, after information was received from two anonymous informants.

The trial court held that the search warrant failed to establish probable cause that the marijuana would be at the location to be searched on the date it was issued. The trial court found that the warrant failed to set forth with specificity the date upon which the anonymous informants observed the marijuana. *See, Commonwealth v. Conner*, 452

Pa. 333, 305 A.2d 341 (1973). However, the trial court went on to deny the defendant's motion to suppress the marijuana. Applying the rationale of *Leon*, the trial court looked beyond the four corners of the affidavit, in order to establish that the officers executing the warrant acted in "good faith" in relying upon the warrant to conduct the search. In reaching this conclusion the trial court also decided that *Leon* permitted the court to undercut the language of Pa.R.Crim.P. 2003,[1] which prohibits oral testimony outside the four corners of the written affidavit to supplement the finding of probable cause.

The Superior Court in a divided panel decision, opinion by Wieand J., dissent by Popovich J., affirmed the judgment of the trial court, specifically relying upon the decision of the United States Supreme Court in *Leon*. *Commonwealth v. Edmunds*, 373 Pa.Super. 384, 541 A.2d 368 (1988). Allocatur was granted by this Court.

The pertinent facts can be briefly summarized as follows. On August 5, 1985 State Police Trooper Michael Deise obtained a warrant from a district magistrate to search a white corrugated building and curtilage on the property of the defendant. The warrant on its face also included the defendant's residence as part of the property to be searched; however, the Commonwealth now concedes that probable cause did not properly exist for the search of the residence. As the affidavit of probable cause is central to our decision, we will set it forth in full:

1. Pa.R. of Crim.P. 2003 provides in relevant part:

(a) No search warrant shall issue but upon probable cause supported by one or more affidavits sworn to before the issuing authority. The issuing authority, in determining whether probable cause has been established, may not consider any evidence outside the affidavits.

(b) At any hearing on a motion for the return or suppression of evidence, or for the suppression of the fruits of the evidence obtained pursuant to a search warrant, no evidence shall be admissible to establish probable cause other than the affidavits provided for in paragraph (a).

Rule 2003 was adopted following this Court's decision in *Commonwealth v. Milliken*, 450 Pa. 310, 300 A.2d 78 (1973). A fuller discussion of Rule 2003 and the *Milliken* case follows at pages 901–02, *infra*.

On the date of August 4, 1985, this affiant Michael D. Deise, Penna. State Police, was in contact by telephone with two anonymous Males who were and are members of the community where Louis R. Edmunds resides. Both anonymous males advised the affiant that while checking out familiar hunting areas off Rte. 31, east of Jones Mills and along the south side of Rte. 31. (sic) These men observed growing marijuana near a white corrugated building approximately 20 × 40 feet in a cleared off area. These men looked into the building and observed several plants that appeared to be marijuana. This affiant questioned both of these men as to their knowledge of marijuana. This affiant learned that one of these men saw growing marijuana numerous times while he was stationed in Viet Nam. The other male saw growing marijuana while at a police station. This affiant described a growing marijuana plant and its characteristics and they agreed that what they had viewed agreed with the description and also that it appeared to them to be marijuana as fully described by the affiant. The two males wish to remain anonymous for fear of retaliation or bodily harm. An anonymous male advised this affiant that Louis R. Edmunds lived there. Edmund's description being that of a white male in his middle thirties and he lived at the aforementioned location.

On the 5th of August, 1985, this affiant with the use of a State Police helicopter, flew over the described location and observed the white corrugated building in the mountain area and located as described by the two males. Also on this date this affiant drove past the Rte. 31 entrance and observed a mail box with "Edmunds 228" printed on it.

After obtaining the warrant from the local magistrate, Trooper Deise, accompanied by three other troopers, served the warrant upon the defendant at his residence. Though he did not place the defendant under arrest at this time, the trooper did advise him of his Miranda rights, and had him read the warrant. The trooper also explained to the defen-

dant that the warrant was not for his residence, although the warrant itself included the residence. Rather, the trooper stated that the warrant was meant to relate to the white corrugated building, and that they were searching for marijuana in that building.

The defendant acknowledged that he owned the land in question, but stated that he leased the white corrugated building to a Thomas Beacon. The defendant, followed by the trooper, went to the second floor of his residence to obtain a copy of the lease to demonstrate that the building was in fact leased to Mr. Beacon. Trooper Deise followed the defendant to ensure that he did not obtain a weapon or otherwise endanger the officers. While accompanying the defendant to the second floor, the trooper noticed near the top of the stairs four (4) large transparent plastic bags containing what appeared to be marijuana. Based upon this discovery the trooper placed the defendant under arrest.

After producing the lease which indicated that the white corrugated building was in fact leased to Thomas Beacon, the defendant accompanied the troopers to the building, which was approximately one-quarter of a mile away, up a steep mountainous terrain, on a separate parcel of property owned by Edmunds. The record is devoid of evidence that there was marijuana growing outside the corrugated building.[2] The defendant unlocked the door of the white building and entered with the troopers. Inside the building the troopers discovered seventeen (17) growing marijuana plants, along with gardening implements, high-wattage lights, and a watering system. The marijuana was seized and the charges as recited above were brought against the defendant.

Prior to trial the defendant moved to suppress the marijuana seized in his residence, the marijuana found growing in the white corrugated building, as well as statements made by defendant Edmunds. A suppression hearing was

2. This fact contradicts the statements in the affidavit, wherein the two anonymous informants allegedly saw marijuana growing outside the white corrugated building.

held by the trial court on January 27, 1986, at which time Trooper Deise testified concerning the information set forth in the affidavit of probable cause. Counsel for defendant moved to suppress all of the above evidence, on the ground that the warrant was constitutionally defective, and probable cause was lacking, because the warrant failed to set forth a time frame in which the informants had observed the marijuana.

Recognizing that the affidavit of probable cause was deficient on its face, the trial court granted the request of the district attorney to convene a supplemental suppression hearing, which occurred on April 21, 1986. The express purpose of this hearing was to allow the district attorney to provide oral supplementation of the facts set forth in the written affidavit and warrant, in order to establish a "good faith" exception to the exclusionary rule under the auspices of *Leon*. The Commonwealth thus introduced evidence that the two informants had observed the marijuana on August 4, 1986, and that such date had been related to District Justice Tlumac prior to the issuance of the warrant, although it was not contained in the affidavit of probable cause or the warrant itself.

Trooper Deise and District Justice Tlumac each offered testimony consistent with that position. However, the testimony of District Justice Tlumac was somewhat ambivalent. She testified that Trooper Deise appeared in her office on August 5, 1986, and related his conversation with the two anonymous informants. She stated that Trooper Deise thereafter dictated the affidavit, which she typed verbatim. She then prepared and issued the search warrant. When asked whether Trooper Deise had indicated that the events in question had occurred the preceding day, District Justice Tlumac testified as follows: "And I felt with knowing Officer Deise over a period of fifteen, twenty years and had countless search warrants, and they were always fresh, that apparently he wouldn't (sic) bring information that just occurred, that was so fresh. The question wouldn't have

even arose (sic) in my mind. And at that time I was under the impression this all occurred the day before."

Upon the close of the supplemental suppression hearing, the trial court found that, strictly adhering to Rule 2003 of the Pennsylvania Rules of Criminal Procedure, this warrant would be incapable of establishing probable cause to justify the search of defendant's property. The warrant failed to set forth a time frame from which a neutral and detached magistrate could reasonably infer that the criminal conduct observed was recent and would most likely still be in progress at the time the warrant was requested. *Conner, supra.*

The trial court went on to reason, however, that the facial invalidity of the warrant did not necessitate the exclusion of the evidence. On the basis of testimony offered by the district attorney at the supplemental suppression hearing, the trial court applied the federal test of *Leon*, and held that where the officer acts in "good faith" reliance upon the District Justice's determination of probable cause, the evidence seized will not be excluded at trial, regardless of the warrant's defects.

The trial court further concluded that the trooper, being reasonably well trained, believed the warrant to be valid because it had been issued by a neutral magistrate. Therefore, the trial court concluded that the trooper acted in "good faith" in executing the warrant, and determined that the federal *Leon* rule permitted the evidence to be introduced, despite the fact that the affidavit was defective and failed to establish probable cause under Pennsylvania law.

The Superior Court adopted the reasoning of the trial court, and went on to hold that Article I Section 8 of the Pennsylvania Constitution afforded no greater protection to its citizens than that provided under the 4th Amendment to the United States Constitution. The Superior Court panel found no compelling reason to deviate from the decision of the United States Supreme Court in *Leon*, and likewise endorsed the federal "good faith" exception to the exclusionary rule as a matter of Pennsylvania jurisprudence.

■ As a preliminary matter, we concur with the inevitable conclusion of the trial court and the Superior Court, that probable cause did not exist on the face of the warrant. In *Conner*, this Court made clear that a search warrant is defective if it is issued without reference to the time when the informant obtained his or her information. *Id.* 452 Pa. at 339, 305 A.2d at 345. Coupled with *Pa.R.Crim.P.* 2003, which mandates that courts in Pennsylvania shall not consider oral testimony outside the four corners of the written affidavit to supplement the finding of probable cause for a search warrant, we are compelled to conclude that the affidavit of probable cause and warrant were facially invalid. *Commonwealth v. Simmons*, 450 Pa. 624, 626, 301 A.2d 819, 820 (1973). As the Superior Court candidly stated, the affidavit in question "did not contain facts from which the date of the hunters' observations could be determined." 373 Pa.Super. at 390, 541 A.2d at 371.[3] Indeed,

3. In *Commonwealth v. Gray*, 509 Pa. 476, 503 A.2d 921 (1986), this Court recently adopted the "totality of the circumstances" analysis set forth by the United States Supreme Court in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), with respect to the establishment of probable cause. This approach allows the court to assess all of the facts and circumstances set forth in the affidavit—including the "veracity" and "basis of knowledge" of the informant—and make a common sense determination whether the magistrate had a "substantial basis for ... conclud[ing] that probable cause existed." *Gates*, 462 U.S. at 238–39, 103 S.Ct. at 2332; *Gray*, 509 Pa. at 484, 503 A.2d at 925. Nothing in the "totality of the circumstances" test, however, allows us to jettison Pa.R.Crim.P. 2003, which requires us to confine our inquiry to the four corners of the document.

Moreover, we note that, even absent the omission of a time frame in the affidavit and warrant, there are other problems with the probable cause determination, which raise serious questions under *Gates* and *Gray*. First, the affidavit specifically states that the hunters observed marijuana growing "near" the white corrugated building in a "cleared off area," and this led them to look inside the building. However, the record is devoid of any testimony that marijuana plants were observed "near" the building, at the time the trooper flew over the building in a helicopter. This factual inconsistency should have raised serious questions concerning the reliability of the informants, under the "veracity of the information" prong of *Gates* since the one fact which would have directly suggested criminal conduct (i.e. marijuana growing near the building) could not be confirmed by the trooper. The only facts which the trooper did confirm were the existence of the building, the existence of a mailbox bearing the name "Edmunds", and the fact that the informants knew what marijuana

the dissenting opinion of Mr. Justice McDermott concedes that probable cause was lacking.

We are not at liberty to ignore the *Leon* issue as it has been injected into the case by the trial court, and expressly affirmed by the Superior Court. Both lower courts have acknowledged, correctly, that Rule 2003 and our decision in *Conner* render the warrant invalid on its face under Pennsylvania law. The only way to salvage the warrant from facial invalidity is to disregard Rule 2003 and consider oral testimony outside the four corners of the affidavit to establish probable cause, which we are not free to do; or to consider the same oral testimony to establish a "good faith" exception under the federal *Leon* test, which is precisely what the trial court sought to accomplish. The trial judge conducted a supplemental suppression hearing for the express purpose of bringing the *Leon* issue four-square into this case, and the Superior Court affirmed explicitly on that basis. The "good faith" exception issue having thus been joined by both courts below, we are now constrained to address it.

The sole question in this case, therefore, is whether the Constitution of Pennsylvania incorporates a "good faith" exception to the exclusionary rule, which permits the introduction of evidence seized where probable cause is lacking on the face of the warrant.

Put in other terms, the question is whether the federal *Leon* test circumvents the acknowledged deficiencies under Pennsylvania law, and prevents the suppression of evidence seized pursuant to an *invalid search warrant*. For the reasons that follow, we conclude that it does not.

looked like. Even under the flexible *Gates* standard, we believe that these facts are thin. The facts confirmed by the trooper are equally consistent with innocence as with guilt. *See, Leon,* 468 U.S. at 903 n. 2, 104 S.Ct. at 3410 n. 2. ("Some details given tended to corroborate, maybe, the reliability of the informant's information about the previous transaction, but if it is not a stale transaction, it comes awfully close to it; and all the other material I think is as consistent with innocence as it is with guilt"). *Compare, Gates* and *Gray,* where the facts corroborated by the police were significantly more indicative of criminal conduct.

## II. UNITED STATES v. LEON

Our starting point must be the decision of the United States Supreme Court in *Leon*. In *Leon*, the Supreme Court in 1984 departed from a long history of exclusionary rule jurisprudence dating back to *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) and *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The Court in *Leon* concluded that the 4th Amendment does not mandate suppression of illegally seized evidence obtained pursuant to a constitutionally defective warrant, so long as the police officer acted in good faith reliance upon the warrant issued by a neutral and detached magistrate.

In *Leon*, police officers in Burbank, California, had initiated a drug investigation after receiving a tip from a confidential informant that large quantities of cocaine and methaqualone were being sold from a residence. The informant had indicated that he witnessed a sale of methaqualone approximately five months earlier. The Burbank police set up a surveillance of three residences, and observed known drug offenders, including Leon, arriving in automobiles and leaving with small packages. *Leon* 468 U.S. at 901–902, 104 S.Ct. at 3409–3410. The officers also observed certain of the suspects boarding separate flights for Miami. *Id.* at 902, 104 S.Ct. at 3409.

Based upon these and other observations, the Burbank police prepared an affidavit and obtained a search warrant from a Superior Court judge. A search of the suspects' residences and automobiles uncovered large quantities of cocaine and methaqualone. *Id.* at 902, 104 S.Ct. at 3409.

After being indicted in federal court, the respondents moved to suppress the evidence. The district court agreed that the affidavit was insufficient to establish probable cause. First, the observations of the informant had been made six months earlier, creating a staleness problem. Second, there was no basis for establishing the reliability or credibility of the informant, who had no track-record with respect to providing reliable information. Moreover, the police investigation "neither cured the staleness nor corrob-

orated the details of the informant's declarations," *Id.* at 904, 104 S.Ct. at 3411. The information gathered by the police officers was "as consistent with innocence as it is with guilt." *Id.* at 903 n. 2, 104 S.Ct. at 3410 n. 2. Thus, the then-existing test for probable cause under *Aguilar-Spinelli* had not been met. *Id.* at 902, n. 2, 104 S.Ct. at 3410, n. 2.

The Court of Appeals in *Leon* affirmed, rejecting the government's invitation to recognize a good faith exception to the exclusionary rule. The United States Supreme Court reversed, in a 6–3 decision.

Justice White, writing for the majority in *Leon,* first indicated that the exclusionary rule was not a "necessary corollary of the Fourth Amendment." 468 U.S. at 905, 104 S.Ct. at 3411. Although *Olmstead v. United States,* 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928) and *Mapp v. Ohio, supra,* had suggested that the exclusion of illegally seized evidence was part-and-parcel of the 4th Amendment's guaranty, the *Leon* Court took the position that the exclusionary rule operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Id.,* quoting *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974).

Justice White went on to conclude that the issue of whether the exclusionary rule should be imposed in a particular case "must be resolved by weighing the costs and benefits" of precluding such evidence from the prosecution's case. *Leon,* 468 U.S. at 906–907, 104 S.Ct. at 3411–3412. On the costs side of the analysis, Justice White declared that the exclusionary rule incurs "substantial social costs" in terms of "imped(ing) unacceptably the truth-finding functions of judge and jury." *Id.* at 907, 104 S.Ct. at 3412 *quoting United States v. Payner,* 447 U.S. 727, 734, 100 S.Ct. 2439, 2445, 65 L.Ed.2d 468 (1980). As a result, Justice White noted that "some guilty defendants may go

free or receive reduced sentences as a result of favorable plea bargains." *Leon,* 468 U.S. at 907, 104 S.Ct. at 3412.

On the benefits side of the analysis, Justice White indicated that the *sole purpose* of the exclusionary rule under the 4th Amendment was to "deter police misconduct rather than to punish the errors of judges and magistrates." *Id.* at 916, 104 S.Ct. at 3417. Given this goal, Justice White concluded that there was no reason to presume that judges or magistrates would be more inclined to "ignore or subvert" the 4th Amendment if evidence seized pursuant to a defective warrant were admissible. The majority wrote: "Although there are assertions that some magistrates become rubber stamps for the police and others may be unable effectively to screen police conduct ... we are not convinced that this is a problem of major proportions." 468 U.S. at 916 n. 14, 104 S.Ct. at 3417 n. 14 (citations omitted).

The Court in *Leon* found that the argument that the exclusionary rule "deters future inadequate presentations" by police officers or prevents "magistrate shopping" was "speculative". *Id.* at 918, 104 S.Ct. at 3418. Consequently, the Fourth Amendment was not served by excluding improperly seized evidence, except on rare occasions. Wrote the Court:

> In most such cases, there is no police illegality and thus nothing to deter. It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable cause determination or his judgment that the form of the warrant is technically sufficient.... Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations. 468 U.S. at 920–921, 104 S.Ct. at 3419.

The *Leon* majority therefore concluded that, where a police officer is acting in objective good faith, based upon a search warrant duly issued by a neutral magistrate or

judge, the 4th Amendment does not require exclusion of such evidence, even where it is later determined that probable cause was lacking for the warrant. Unless the police officer acted "knowingly" or "recklessly" in providing false information to the magistrate, or the affidavit of probable cause is "so lacking in indicia of probable cause as to render official belief in its existence unreasonable," the evidence is admissible. *Leon,* at 923, 104 S.Ct. at 3421, *quoting, Brown v. Illinois,* 422 U.S. 590, 610–611, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975).

Thus, the *Leon* Court concluded that the drugs obtained through a defective search warrant, unsupported by probable cause, were nonetheless admissible as evidence without controverting the 4th Amendment. *Leon,* 468 U.S. at 925–926, 104 S.Ct. at 3421–3422.[4]

The U.S. Supreme Court subsequently broadened the good-faith exception to the exclusionary rule, in the recent case of *Illinois v. Krull,* 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987). In *Krull,* the Court held that a good-faith exception to the exclusionary rule permits the introduction of evidence obtained by an officer in reliance upon a statute, even where that statute is thereafter determined to be unconstitutional. *Cf. Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), and *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) (previously indicating that the use of such evidence violated the 4th Amendment).

We must now determine whether the good-faith exception to the exclusionary rule is properly part of the jurisprudence of this Commonwealth, by virtue of Article 1, Section 8 of the Pennsylvania Constitution. In concluding that it is not, we set forth a methodology to be followed in analyzing

**4.** In the companion case of *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984), the evidence obtained by the police officer in good faith reliance upon a warrant issued by a neutral magistrate was deemed admissible, even though the warrant was facially defective in failing to describe with particularity the items to be seized. The search was intended for weapons, however, the warrant was issued on a pre-printed form authorizing searches for controlled substances. 468 U.S. at 987, 104 S.Ct. at 3427.

future state constitutional issues which arise under our own Constitution.

## III. FACTORS TO CONSIDER IN UNDERTAKING PENNSYLVANIA CONSTITUTIONAL ANALYSIS

■ This Court has long emphasized that, in interpreting a provision of the Pennsylvania Constitution, we are not bound by the decisions of the United States Supreme Court which interpret similar (yet distinct) federal constitutional provisions. *See Commonwealth v. Sell*, 504 Pa. 46, 470 A.2d 457 (1983); *Commonwealth v. Melilli*, 521 Pa. 405, 555 A.2d 1254 (1989); *Commonwealth v. Bussey*, 486 Pa. 221, 404 A.2d 1309 (1979); *Commonwealth v. DeJohn*, 486 Pa. 32, 403 A.2d 1283 (1979), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 704, 62 L.Ed.2d 668 (1980). *Commonwealth v. Triplett*, 462 Pa. 244, 341 A.2d 62 (1975); *Commonwealth v. Richman*, 458 Pa. 167, 320 A.2d 351 (1974); *Commonwealth v. Campana*, 452 Pa. 233, 304 A.2d 432, vacated, 414 U.S. 808, 94 S.Ct. 73, 38 L.Ed.2d 44 *on remand*, 455 Pa. 622, 314 A.2d 854, *cert. denied*, 417 U.S. 969, 94 S.Ct. 3172, 41 L.Ed.2d 1139 (1974).

As Mr. Chief Justice Nix aptly stated in *Sell*, the federal constitution establishes certain minimum levels which are "equally applicable to the [analogous] state constitutional provision." *Id.* 504 Pa. at 63, 470 A.2d at 466, *quoting, Commonwealth v. Platou*, 455 Pa. 258, 260 n. 2, 312 A.2d 29, 31 n. 2 (1973). However, each state has the power to provide broader standards, and go beyond the minimum floor which is established by the federal Constitution. *Sell*, 504 Pa. at 63, 470 A.2d at 467.[5]

The United States Supreme Court has repeatedly affirmed that the states are not only free to, but also encour-

5. Similarly, Justice Pollock of the New Jersey Supreme Court recently explained: "The first ten amendments (to the U.S. Constitution) establish a foundation for the protection of human liberty. A state may not undermine that foundation, but its constitution may build additional protections above the federal floor." Pollock, Adequate and Independent State Grounds as a Means of Balancing the Relationship Between State and Federal Courts, 63 Tex.L.Rev. 977, 980 (1985).

aged to engage in independent analysis in drawing meaning from their own state constitutions. *See PruneYard Shopping Center v. Robins,* 447 U.S. 74, 80–82, 100 S.Ct. 2035, 2040–41, 64 L.Ed.2d 741 (1980) (Rehnquist, J.). Indeed, this is a positive expression of the jurisprudence which has existed in the United States since the founding of the nation. Alexander Hamilton, lobbying for the ratification of the U.S. Constitution in the Federalist Papers over two hundred years ago, made clear that the Supremacy Clause of the Federal Constitution was never designed to overshadow the states, or prevent them from maintaining their own pockets of autonomy. *See,* The Federalist No. 33 (A. Hamilton), in *The Federalist Papers* (The New American Library ed.) 204.

The past two decades have witnessed a strong resurgence of independent state constitutional analysis, in Pennsylvania and elsewhere. *See* Brennan, *State Constitutions and the Protection of Individual Rights,* 90 Harv.L.Rev. 489 (1977); *Developments in the Law—The Interpretation of State Constitutional Rights,* 95 Harv.L.Rev. 1324 (1982); Linde, *E Pluribus–Constitutional Theory and State Courts,* 18 Ga.L.Rev. 165 (1984); Abrahamson, *Criminal Law and State Constitutions: The Emergence of State Constitutional Law,* 63 Tex.L.Rev. 1141 (1985); Mosk, *State Constitutionalism: Both Liberal and Conservative,* 63 Tex.L. Rev. 1081 (1985); Brennan, *Symposium on the Revolution in State Constitutional Law,* 13 Vt.L.Rev. 11 (1988).

Here in Pennsylvania, we have stated with increasing frequency that it is both important and necessary that we undertake an independent analysis of the Pennsylvania Constitution, each time a provision of that fundamental document is implicated. Although we may accord weight to federal decisions where they "are found to be logically persuasive and well reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees," *Commonwealth v. Tarbert* 517 Pa. 277, 283, 535 A.2d 1035, 1038 (1987), *quoting,* Brennan, *State Constitutions and the Protection of Individual Rights,* 90 Harv.L.

Rev. 489, 502 (1977), we are free to reject the conclusions of the United States Supreme Court so long as we remain faithful to the minimum guarantees established by the United States Constitution.

■ The recent focus on the "New Federalism" [6] has emphasized the importance of state constitutions with respect to individual rights and criminal procedure. As such, we find it important to set forth certain factors to be briefed and analyzed by litigants in each case hereafter implicating a provision of the Pennsylvania constitution.[7] The decision of the United States Supreme Court in *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), now requires us to make a "plain statement" of the adequate and independent state grounds upon which we rely, in order to avoid any doubt that we have rested our decision squarely upon Pennsylvania jurisprudence. Accordingly, as a general rule it is important that litigants brief and analyze at least the following four factors:

1) text of the Pennsylvania constitutional provision;

2) history of the provision, including Pennsylvania case-law;

3) related case-law from other states;

4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence.

Depending upon the particular issue presented, an examination of related federal precedent may be useful as part of the state constitutional analysis, not as binding authority,

6. The term "New Federalism" has been used increasingly to define the recent emphasis on independent state constitutional analysis. "Federalism in the Twenty–First Century," in *Federalism—The Shifting Balance* (J. Griffith ed. 1989); Abrahamson & Gutmann, *The New Federalism: State Constitutions and State Courts*, 71 Judicature 88 (1987); See, e.g., Peters, *State Constitutional Law: Federalism in the Common Law Tradition*, 84 Mich.L.Rev. 583 (1986); and, Douglas, *Federalism and State Constitutions*, 13 Vt.L.Rev. 127 (1988).

7. These factors have been culled from the prior decisions of this Court which have established a framework for state constitutional analysis in Pennsylvania. *See, e.g., Commonwealth v. Sell, Commonwealth v. DeJohn,* and *Commonwealth v. Melilli.*

but as one form of guidance. However, it is essential that courts in Pennsylvania undertake an independent analysis under the Pennsylvania Constitution. Utilizing the above four factors, and having reviewed *Leon,* we conclude that a "good faith" exception to the exclusionary rule would frustrate the guarantees embodied in Article I, Section 8 of our Commonwealth's constitution.

## IV. ANALYSIS

A. *Text*

The text of Article 1, Section 8 of the Pennsylvania Constitution provides as follows:

### *Security from Searches and Seizures*

Section 8. The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Although the wording of the Pennsylvania Constitution is similar in language to the Fourth Amendment of the United States Constitution,[8] we are not bound to interpret the two provisions as if they were mirror images, even where the text is similar or identical. *See, e.g., Tarbert,* 517 Pa. at 283, 535 A.2d at 1038.[9] Thus, we must next examine the

**8.** The 4th Amendment of the United States Constitution reads as follows:

#### *Amendment IV*

"The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

**9.** There are certain provisions of the Pennsylvania Constitution which have no direct analogue under the federal constitution. *See, e.g., Commonwealth v. Butler,* 458 Pa. 289, 328 A.2d 851 (1974) (interpreting Art. I, Sec. 28). In such cases, the need for independent analysis is even more significant.

history of Article I, Section 8, in order to draw meaning from that provision and consider the appropriateness of a "good faith" exception to the exclusionary rule in the Pennsylvania constitutional scheme.

## B. *History*

We have made reference, on repeated occasions, to the unique history of Article 1, Section 8, as well as other provisions of the Pennsylvania Constitution. As we noted in *Sell:* "constitutional protection against unreasonable searches and seizures existed in Pennsylvania more than a decade before the adoption of the federal Constitution, and fifteen years prior to the promulgation of the Fourth Amendment." *Id.* 504 Pa. at 63, 470 A.2d at 466.

Perhaps the extent of the untapped history of the Pennsylvania Constitution should be underscored. Pennsylvania's Constitution was adopted on September 28, 1776, a full ten years prior to the ratification of the U.S. Constitution. Like the constitutions of Virginia, New Jersey, Maryland, and most of the original 13 Colonies, Pennsylvania's Constitution was drafted in the midst of the American Revolution, as the first overt expression of independence from the British Crown. *See* W. Adams, *The First American Constitutions* at 61 (1980). The Pennsylvania Constitution was therefore meant to reduce to writing a deep history of unwritten legal and moral codes which had guided the colonists from the beginning of William Penn's charter in 1681. *See* White, *Commentaries on the Constitution of Pennsylvania* (1907). Unlike the Bill of Rights of the United States Constitution which emerged as a later addendum in 1791, the Declaration of Rights in the Pennsylvania Constitution was an organic part of the state's original constitution of 1776, and appeared (not coincidentally) first in that document.

Thus, contrary to the popular misconception that state constitutions are somehow patterned after the United States Constitution, the reverse is true. The federal Bill of Rights borrowed heavily from the Declarations of Rights

contained in the constitutions of Pennsylvania and other colonies. *See* Brennan, *The Bill of Rights and the States,* in *The Great Rights* 67 (E. Cahn ed. 1963). For instance, the Pennsylvania Declaration of Rights was the "direct precursor" of the freedom of speech and press. See 1 B. Schwartz, *The Bill of Rights: A Documentary History* 262 (1971). The Delaware Declaration of Rights prohibited quartering of soldiers and ex-post facto laws. *Id.* at 276–78. North Carolina's Declaration of Rights provided a number of protections to the criminally accused—the right to trial by jury, the privilege against self-incrimination, and others—which later appeared in the United States Constitution. *Id.* at 286–88.

With respect to Article 1, Section 8 of the present Pennsylvania Constitution, which relates to freedom from unreasonable searches and seizures, that provision had its origin prior to the 4th Amendment, in Clause 10 of the original Constitution of 1776. *See Sell,* 504 Pa. at 63, 470 A.2d at 466. Specifically, the original version of the search and seizure provision reads as follows:

The people have a right to hold themselves, their houses, papers and possessions free from search and seizure, and therefore warrants without oaths or affirmations first made, affording sufficient foundation for them, and whereby any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his or their property, not particularly described, are contrary to that right and ought not be granted.

*See* Buckalew, *An Examination of the Constitution of Pennsylvania* at 13 (1883). The above provision was reworded at the time the Pennsylvania Constitution was revised extensively in 1790, and reappeared as Article 1, Section 8. The modern version of that provision has remained untouched for two hundred years, with the exception of the words "subscribed to by the affiant," which were added by the Constitutional Convention of 1873. *Id.*

The requirement of probable cause in this Commonwealth thus traces its origin to its original Constitution of 1776, drafted by the first convention of delegates chaired by Benjamin Franklin. *See* White, *supra,* at xxiii. The primary purpose of the warrant requirement was to abolish "general warrants," which had been used by the British to conduct sweeping searches of residences and businesses, based upon generalized suspicions. *See* White, *supra,* at 158; *Wakely v. Hart,* 6 Binn. 316 (1814). Therefore, at the time the Pennsylvania Constitution was drafted in 1776, the issue of searches and seizures unsupported by probable cause was of utmost concern to the constitutional draftsmen. *Id.*

Moreover, as this Court has stated repeatedly in interpreting Article 1, Section 8, that provision is meant to embody a strong notion of privacy, carefully safeguarded in this Commonwealth for the past two centuries. As we stated in *Sell:* "the survival of the language now employed in Article 1, Section 8 through over 200 years of profound change in other areas demonstrates that the paramount concern for privacy first adopted as part of our organic law in 1776 continues to enjoy the mandate of the people of this Commonwealth." *Id.* 504 Pa. at 65, 470 A.2d at 467. *See, also, Commonwealth v. Melilli; Commonwealth v. Bussey; Commonwealth v. DeJohn; Commonwealth v. Triplett; Commonwealth v. Richman; Commonwealth v. Campana; Commonwealth v. Platou,* 455 Pa. 258, 312 A.2d 29 (1973), *cert. denied, Pennsylvania v. Platou,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *Denoncourt v. Com., State Ethics Com.,* 504 Pa. 191, 470 A.2d 945 (1983); *Commonwealth v. Miller,* 513 Pa. 118, 518 A.2d 1187 (1986); *Commonwealth v. Blystone,* 519 Pa. 450, 549 A.2d 81 (1988).

The history of Article I, Section 8, thus indicates that the purpose underlying the exclusionary rule in this Commonwealth is quite distinct from the purpose underlying the exclusionary rule under the 4th Amendment, as articulated by the majority in *Leon.*

The United States Supreme Court in *Leon* made clear that, in its view, the *sole purpose* for the exclusionary rule under the 4th Amendment was to deter police misconduct. *Id.* 468 U.S. at 916, 104 S.Ct. at 3417. The *Leon* majority also made clear that, under the Federal Constitution, the exclusionary rule operated as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Id.* 468 U.S. at 906, 104 S.Ct. at 3412, 82 L.Ed.2d at 687 *quoting, United States v. Calandra, supra,* 414 U.S. at 348, 94 S.Ct. at 620.

This reinterpretation differs from the way the exclusionary rule has evolved in Pennsylvania since the decision of *Mapp v. Ohio* in 1961 and represents a shift in judicial philosophy from the decisions of the United States Supreme Court dating back to *Weeks v. United States.*

Like many of its sister states, Pennsylvania did not adopt an exclusionary rule until the United States Supreme Court's decision in *Mapp* required it to do so. *See, Elkins v. U.S.,* 364 U.S. 206, 225, 80 S.Ct. 1437, 1448, 4 L.Ed.2d 1669 (1960). However, at the time the exclusionary rule was embraced in Pennsylvania, we clearly viewed it as a constitutional mandate. *Commonwealth v. Bosurgi,* 411 Pa. 56, 190 A.2d 304 (1963) (interpreting *Mapp* to require the exclusion of illegally seized evidence as "an essential part of both the 4th and 14th Amendments,") *Id.* at 64, 190 A.2d at 309, *quoting, Mapp,* 367 U.S. at 657, 81 S.Ct. at 1693. This interpretation was in keeping with a long line of federal cases, beginning with *Weeks* in 1914, which viewed the exclusionary rule as a necessary corrolary to the prohibition against unreasonable searches and seizures.[10]

10. As early as *Weeks,* the United States Supreme Court made clear that the exclusionary rule was a necessary adjunct of the 4th Amendment; without it, the protections of the 4th Amendment "might as well be stricken from the Constitution." *Id.,* 232 U.S. at 393, 34 S.Ct. at 344. The *Weeks* Court referred to the exclusionary rule as "that command which this Court has held to be a clear, specific, and constitutionally required—even if judicially implied—deterrent safeguard without insistence upon which the Fourth Amendment would have been reduced to a 'form of words.'" *Id.* at 392, 34 S.Ct. at 344.

As one commentator noted in piecing together the history of the exclusionary rule: " 'Deterrence', now claimed to be the primary ground for exclusion, seems to have had no substantial place in any of these conceptions of the practice." *See*, White, *Forgotten Points in the Exclusionary Rule Debate*, 81 Mich.L.Rev. 1273, 1279 (1983).

During the first decade after *Mapp*, our decisions in Pennsylvania tended to parallel the cases interpreting the 4th Amendment. However, beginning in 1973, our case-law began to reflect a clear divergence from federal precedent. The United States Supreme Court at this time began moving towards a metamorphosed view, suggesting that the purpose of the exclusionary rule "is not to redress the injury to the *privacy* of the search victim (but, rather) to deter future *unlawful police conduct.*" *Calandra*, 414 U.S. at 347, 94 S.Ct. at 619 (emphasis added); *See, also, U.S. v. Peltier*, 422 U.S. 531, 536, 95 S.Ct. 2313, 2317, 45 L.Ed.2d 374 (1975). At the same time this Court began to forge its own path under Article I, Section 8 of the Pennsylvania Constitution, declaring with increasing frequency that Article I, Section 8 of the Pennsylvania Constitution embodied a strong notion of privacy, notwithstanding federal cases to the contrary. In *Commonwealth v. Platou* and *Commonwealth v. DeJohn*, we made explicit that "the

In *Mapp v. Ohio*, Justice Clark stated that the exclusionary rule was "an essential part of both the Fourth and the Fourteenth Amendments." 367 U.S. at 657, 81 S.Ct. at 1692. To hold otherwise, wrote the Court in *Mapp*, would be "to grant the right but in reality to withhold its privilege and enjoyment." *Id.* at 656, 81 S.Ct. at 1692.

As the late Justice Potter Stewart explained in an exhaustive examination of the origin of the exclusionary rule in the Columbia Law Review, the "proscriptions and guarantees in the (Bill of Rights) were intended to create legal rights and duties." 83 Col.L.Rev. 1368, 1384. Although the Fourth Amendment (like most of the Bill of Rights) did not specifically set forth sanctions for violations, "(t)he primary responsibility for enforcing the Constitution's limits on government, at least since the time of *Marbury v. Madison*, [5 U.S. (1 Cranch.) 137, 2 L.Ed. 60 (1803) ], has been vested in the judicial branch." *Id.* at 1384. Thus, Justice Stewart concluded as a matter of history, that "the exclusion of unconstitutionally obtained evidence is not a constitutional *right*, but a constitutional *remedy,*" without which the 4th Amendment would be reduced to a hollow promise. *Id.* at 1384 (emphasis in original).

right to be free from unreasonable searches and seizures contained in Article I, Section 8 of the Pennsylvania Constitution is tied into the implicit right to privacy in this Commonwealth." *DeJohn*, 486 Pa. at 49, 403 A.2d at 1291. In *DeJohn*, we specifically refused to follow the U.S. Supreme Court's decision in *U.S. v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), which had held that a citizen had no standing to object to the seizure of his or her bank records.

From *DeJohn* forward, a steady line of case-law has evolved under the Pennsylvania Constitution, making clear that Article I, Section 8 is unshakably linked to a right of privacy in this Commonwealth. *See, Commonwealth v. Platou*, (1973); *Commonwealth v. DeJohn*, (1979); *Commonwealth v. Sell*, (1983); *Commonwealth v. Miller*, (1986); *Commonwealth v. Blystone*, (1988); and *Commonwealth v. Melilli*, (1989).

As Mr. Justice Flaherty noted in *Denoncourt, supra*, in echoing the wisdom of Justice Brandeis over 60 years ago: "The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness ... They conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." *Id.* 504 Pa. at 199, 470 A.2d at 948–49, *quoting Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

Most recently, in *Melilli*, this Court cited with approval the decision of the Superior Court in *Commonwealth v. Beauford*, 327 Pa.Super. 253, 475 A.2d 783 (1984), *allocatur denied*, 508 Pa. 319, 496 A.2d 1143 (1985), holding that Article I, Section 8 of the Pennsylvania Constitution was offended by the installation of a pen register device without probable cause. Mr. Justice Papadakos, in rejecting the holding of the United States Supreme Court in *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), emphasized that "Article I, Section 8 of the Pennsylvania Constitution ... may be employed to guard *individu-*

*al privacy* rights against unreasonable searches and sei-
zures more zealously than the federal government does
under the Constitution of the United States by serving as
an independent source of supplemental rights." *Id.* 521 Pa.
at 412, 555 A.2d at 1258. Mr. Justice Papadakos went on to
conclude that, because a pen register "is the equivalent of a
search warrant in its operative effect where the intrusion
involves a violation of a privacy interest," the affidavit and
order "must comply with the requirements of probable
cause required under Pa.Rules of Criminal Procedure Chap-
ter 2000, Search Warrants." *Id.*, 521 Pa. at 414, 555 A.2d
1259.

Thus, the exclusionary rule in Pennsylvania has consist-
ently served to bolster the twin aims of Article I, Section 8;
to-wit, the safeguarding of privacy and the fundamental
requirement that warrants shall only be issued upon proba-
ble cause. *Melilli, supra.* As this Court explained in
*Commonwealth v. Miller:*

> The linch-pin that has been developed to determine
> whether it is appropriate to issue a search warrant is the
> test of probable cause. *Commonwealth v. Chandler*
> [505 Pa. 113, 477 A.2d 851], *supra.* It is designed to
> protect us from unwarranted and even vindictive incur-
> sions upon our privacy. It insulates from dictatorial and
> tyrannical rule by the state, and preserves the concept of
> democracy that assures the freedom of its citizens. This
> concept is second to none in its importance in delineating
> the dignity of the individual living in a free society. *Id.*
> 513 Pa. at 127, 518 A.2d at 1191–92.

Whether the United States Supreme Court has deter-
mined that the exclusionary rule does not advance the 4th
Amendment purpose of deterring police conduct is irrele-
vant. Indeed, we disagree with that Court's suggestion in
*Leon* that we in Pennsylvania have been employing the
exclusionary rule all these years to deter police corruption.
We flatly reject this notion. We have no reason to believe
that police officers or district justices in the Commonwealth
of Pennsylvania do not engage in "good faith" in carrying
out their duties. What is significant, however, is that our

Constitution has historically been interpreted to incorporate a strong right of privacy, and an equally strong adherence to the requirement of probable cause under Article 1, Section 8. Citizens in this Commonwealth possess such rights, even where a police officer in "good faith" carrying out his or her duties inadvertently invades the privacy or circumvents the strictures of probable cause. To adopt a "good faith" exception to the exclusionary rule, we believe, would virtually emasculate those clear safeguards which have been carefully developed under the Pennsylvania Constitution over the past 200 years.

## C. *Related Case–Law From Other States*

A number of states other than Pennsylvania have confronted the issue of whether to apply a "good faith" exception to the exclusionary rule, under their own constitutions, in the wake of *Leon.*

The highest courts of at least two states—Arkansas and Missouri—have seemingly embraced the good faith exception under their own constitutions. *See Jackson v. State,* 291 Ark. 98, 722 S.W.2d 831 (1987); *State v. Brown,* 708 S.W.2d 140 (Mo.1986) (en banc). Intermediary appellate courts in at least four other states—Indiana, Kansas, Maryland and Louisiana—have indicated their acceptance of the "good faith" exception. *See, Mers v. State,* 482 N.E.2d 778 (Ind.Ct.App.1985); *State v. Huber,* 10 Kan.App.2d 560, 704 P.2d 1004 (1985); *Howell v. State,* 60 Md.App. 463, 483 A.2d 780 (1984). *State v. Martin,* 487 So.2d 1295 (La.App.3d Cir.), *writ denied* 491 So.2d 25 (La.1986). In virtually all of those states embracing the "good-faith" exception under their own constitutions, however, the reasoning is a simple affirmation of the logic of *Leon,* with little additional state constitutional analysis.[11]

---

**11.** A number of state courts have applied the federal *Leon* test, without any independent analysis under their state constitutions. *See, e.g., State v. Wilmoth,* 22 Ohio St.3d 251, 490 N.E.2d 1236 (1986); *Hyde v. State,* 769 P.2d 376 (Wyo.1989). For a complete list of those states which have adopted and rejected *Leon,* with or without analysis,

On the other hand, the highest courts of at least four states—New Jersey, New York, North Carolina and Connecticut—have chosen to reject the "good-faith" exception under their own constitutions, with more detailed analysis of state constitutional principles. *See State v. Marsala,* 216 Conn. 150, 579 A.2d 58 (1990), *State v. Novembrino,* 105 N.J. 95, 519 A.2d 820 (N.J.1987); *People v. Bigelow,* 66 N.Y.2d 417, 497 N.Y.S.2d 630, 488 N.E.2d 451 (1985); *State v. Carter,* 322 N.C. 709, 370 S.E.2d 553 (1988). *See, also, Mason v. State,* 534 A.2d 242 (Del.1987) (rejecting good-faith exception as statutory matter); *Commonwealth v. Upton,* 394 Mass. 363, 476 N.E.2d 548 (1985) (same); *Stringer v. State,* 491 So.2d 837 (Miss.1986) (Robertson, J., concurring). The intermediate appellate courts of at least four additional states—Tennessee, Wisconsin, Michigan, and Minnesota—have likewise eschewed the logic of *Leon* under their own state constitutions. *See State v. Taylor,* 763 S.W.2d 756 (Tenn.Crim.App.1987); *State v. Grawein,* 123 Wis.2d 428, 367 N.W.2d 816 (Ct.App.1985); *People v. Sundling,* 153 Mich.App. 277, 395 N.W.2d 308 (1986); *State v. Herbst,* 395 N.W.2d 399, 404 (Minn.App.1986).

A mere scorecard of those states which have accepted and rejected *Leon* is certainly not dispositive of the issue in Pennsylvania. However, the logic of certain of those opinions bears upon our analysis under the Pennsylvania Constitution, particularly given the unique history of Article 1, Section 8.

In this respect, we draw support from other states which have declined to adopt a "good faith" exception, particularly New Jersey, Connecticut and North Carolina. In *State v. Novembrino, supra,* the New Jersey Supreme Court found that the "good faith" exception to the exclusionary rule was inconsistent with the New Jersey Constitution, because it would undermine the requirement of probable cause. Although New Jersey, like Pennsylvania, had no exclusionary rule in place prior to *Mapp v. Ohio* in 1961, the New Jersey

*see,* Uchida *et al, Acting In Good Faith: The Effects of United States v. Leon on the Police and Courts,* 30 Ariz.L.Rev. 467, 475–480 (1988).

Court found that it had become "imbedded" in the jurisprudence under that state's constitution. As the New Jersey court wrote in *Novembrino:*

The exclusionary rule, by virtue of its consistent application over the past twenty-five years, has become an integral element of our state-constitutional guarantee that search warrants will not issue without probable cause. Its function is not merely to deter police misconduct. The rule also serves as the indispensable mechanism for vindicating the constitutional right to be free from unreasonable searches. *Id.* 519 A.2d at 856.

Similarly, the Connecticut Supreme Court—which most recently rejected the good faith exception on August 7, 1990—concluded that the purpose of the exclusionary rule under Article I, Section 7 of the Connecticut Constitution, was to "preserve the integrity of the warrant issuing process as a whole." *State v. Marsala,* 216 Conn. at 169, 579 A.2d at 67, *quoting,* S. Wasserstrom & W. Mertens, *The Exclusionary Rule on the Scaffold: But was it a Fair Trial?* 22 AM.Crim.L.Rev. 85,111. Thus, when evidence was suppressed under this provision due to a defective warrant, "the issuing authority ... is not being 'punished' for a mistake, but is, rather, being informed that a constitutional violation has taken place and is also being instructed in how to avoid such violations in the future." *Marsala,* at 168, 579 A.2d at 67.

More directly on point, the North Carolina Supreme Court in *State v. Carter, supra,* rejected the "good faith" exception to the exclusionary rule, noting the importance of the *privacy rights* flowing from the search and seizure provision in the North Carolina Constitution. The court in *Carter* emphasized the need to preserve the integrity of the judiciary in North Carolina, in excluding illegally seized evidence when such important rights of the citizenry were at stake. Wrote the North Carolina Supreme Court:

The exclusionary sanction is indispensable to give effect to the constitutional principles prohibiting unreasonable search and seizure. We are persuaded that the

exclusionary rule is the only effective bulwark against governmental disregard for constitutionally protected privacy rights. Equally of importance in our reasoning, we adhere to the rule for the sake of maintaining the integrity of the judicial branch of government. *Id.* 370 S.E.2d at 559.

We similarly conclude that, given the strong right of privacy which inheres in Article 1, Section 8, as well as the clear prohibition against the issuance of warrants without probable cause, or based upon defective warrants, the good faith exception to the exclusionary rule would directly clash with those rights of citizens as developed in our Commonwealth over the past 200 years. To allow the judicial branch to participate, directly or indirectly, in the use of the fruits of illegal searches would only serve to undermine the integrity of the judiciary in this Commonwealth. *See, Carter, supra, Marsala, supra.* From the perspective of the citizen whose rights are at stake, an invasion of privacy, in good faith or bad, is equally as intrusive. This is true whether it occurs through the actions of the legislative, executive or the judicial branch of government.

## D. *Policy Considerations*

We recognize that, in analyzing any state constitutional provision, it is necessary to go beyond the bare text and history of that provision as it was drafted 200 years ago, and consider its application within the modern scheme of Pennsylvania jurisprudence. An assessment of various policy considerations, however, only supports our conclusion that the good faith exception to the exclusionary rule would be inconsistent with the jurisprudence surrounding Article 1, Section 8.

First, such a rule would effectively negate the judicially created mandate reflected in the Pennsylvania Rules of Criminal Procedure, in Rules 2003, 2005 and 2006. Specifically, Rule 2003 relates to the requirements for the issuance of a warrant, and provides in relevant part:

(a) No search warrant shall issue but upon probable cause supported by one or more affidavits sworn to before the issuing authority. The issuing authority, in determining whether probable cause has been established, may not consider any evidence outside the affidavits.

(b) At any hearing on a motion for the return or suppression of evidence, or for suppression of the fruits of evidence, obtained pursuant to a search warrant, no evidence shall be admissible to establish probable cause other than the affidavits provided for in paragraph (a).

Rule 2003 thus adopts a "four corners" requirement, and provides that only evidence contained within the four corners of the affidavit may be considered to establish probable cause. This Rule, along with Rules 2005 and 2006 [12]

**12.** Rule 2005 of the Pa. Rules of Criminal Procedure, relating to contents of search warrants, provides in relevant part:

Each search warrant shall be signed and sealed by the issuing authority and shall:

(a) Specify the date and time of issuance;

(b) Identify specifically the property to be seized;

(c) Name or describe with particularity the person or place to be searched; ...

(g) *Certify that the issuing authority has found probable cause based upon the facts sworn to or affirmed before the issuing authority by written affidavit(s) attached to the warrant.* (emphasis added).

Rule 2006 of the Pa. Rules of Criminal Procedure relating to contents of application for search warrant, sets forth what shall be contained in the written affidavit as follows:

Each application for a search warrant shall be by written affidavit(s) signed and sworn to or affirmed before an issuing authority, which affidavit(s) shall:

(a) State the name and department, agency, or address of the affiant;

(b) Identify specifically the items or property to be searched for and seized;

(c) Name or describe with particularity the person or place to be searched;

(d) Identify the owner, occupant, or possessor of the place to be searched;

(e) Specify or describe the crime which has been or is being committed;

(f) *Set forth specifically the facts and circumstances which form the basis for the affiant's conclusion that there is probable cause to believe that the items or property identified are evidence or the fruit of a crime, or are contraband, or are otherwise unlawfully possessed*

which reiterate that probable cause must exist on the face of the affidavit, were promulgated by this Court following this Court's decision in *Commonwealth v. Milliken*, 450 Pa. 310, 300 A.2d 78 (1973). The decision in *Milliken* is significant, because it makes clear that the "four corners" requirement of Rule 2003 was carefully and deliberately established in this Commonwealth.

In *Milliken*, a police officer had obtained a warrant to search the defendant's home for evidence relating to a murder, based upon an informant's tip. The affidavit of probable cause failed to set forth sufficient facts to establish the "reliability" of the informant, under the prevailing *Aguilar–Spinelli* test, rendering the warrant defective. At the suppression hearing, however, the police officer testified that he had given additional sworn oral testimony to the magistrate at the time the warrant was issued, not reduced to writing, which established the informant's reliability. The magistrate admitted that his memory was "dimmed" by the fact the proceeding was "some time ago," but essentially corroborated the officer's story.

This Court in *Milliken* rejected the contention that Article I, Section 8 of the Pennsylvania Constitution itself mandated that all facts relied upon to establish probable cause be reduced to writing; the constitutional language itself contained no such requirement. *Id.* 450 Pa. at 314, 300 A.2d at 81. We therefore held that the sworn oral testimony of the

> or subject to seizure, and that these items or property are located on the particular person or at the particular place described ... (emphasis added).
>
> When Rules 2005 and 2006 are read in conjunction with Rule 2003, there is absolutely no question that oral statements of the police officer not in writing—of the sort made in the instant case by Trooper Deise—may not be considered in determining whether probable cause has been established. This is mandated by the Rules regardless of whether the officer's statements are made under oath. The Rules limit the probable cause determination to those facts set forth in the "written affidavit(s) attached to the warrant," (Rule 2005) and specifically enumerate those facts which shall be contained in the written affidavit (Rule 2006). The very purpose of these Rules was to eliminate resort to facts and statements *dehors* the written documentation, in order to avoid any danger of later reconstructing events in a skewed fashion, whether intentionally or not. *See Milliken, supra.*

police officer in that case could be used to supplement the affidavit. *Id.* However, we went on to express deep concern for the fact that "the 'passage of time' inevitably causes 'memories ... (to) fade.'" *Id.*, 450 Pa. at 313, 300 A.2d at 80, *quoting, Dickey v. Florida*, 398 U.S. 30, 42, 90 S.Ct. 1564, 1571, 26 L.Ed.2d 26 (1970) (Brennan, J., concurring). We stated that without a transcribed record made contemporaneously with the issuance of the warrant, "subsequent review of the partially unwritten proceeding may become tainted by possible additions of relevant information initially omitted but later supplied by hindsight." *Id.* 450 Pa. at 313, 300 A.2d at 80.

Recognizing this "troublesome" dilemma, this Court in a thoughtful opinion written by the late Mr. Justice Roberts (later Chief Justice Roberts) and joined by then Mr. Justice, now Chief Justice Nix, announced in *Milliken* that we would exercise our supervisory powers to formulate a rule of procedure mandating that "a sufficient written record (be) made contemporaneously with the issuance of search warrants." *Id.*, 450 Pa. at 315, 300 A.2d at 81. We held that since this rule was procedural in nature, it could not be applied retroactively to invalidate the warrant in Milliken's case. However, we made clear that: "After the effective date of the rule the determination of probable cause by a suppression hearing court and an appellate court upon review will be made *only* from the written record prepared contemporaneously with the issuance of the search warrant." *Id.*, 450 Pa. at 315 n. 3, 300 A.2d at 81 n. 3 (emphasis in original). The result was the adoption of Pa.R.Crim.P. 2003 on March 28, 1973, effective in 60 days, which made explicit that probable cause for search warrants in Pennsylvania may be based only upon materials contained within the four corners of the written affidavit.

Rule 2003 thus serves to underscore the incongruity of adopting a good faith exception to the exclusionary rule in Pennsylvania. Although Rule 2003 is not constitutionally mandated by Article 1, Section 8, as *Milliken* correctly

explains,[13] it reflects yet another expression of this Court's unwavering insistence that probable cause exist before a warrant is issued, and only those facts memorialized in the written affidavit may be considered in establishing probable cause, in order to eliminate any chance of incomplete or reconstructed hindsight. It is true, as *Milliken* summarizes, that the history of Article 1, Section 8 does not itself prohibit the use of oral testimony to establish probable cause, outside the four corners of the warrant. Nonetheless, we have chosen to adopt that Rule as an administrative matter, *id.,* 450 Pa. at 315, 300 A.2d at 81, and that Rule has now stood in Pennsylvania for 17 years.

In the instant case, probable cause—as defined under Pennsylvania law—is lacking. Two lower courts have so held; we concur. Applying the federal *Leon* test would not only frustrate the procedural safeguards embodied in Rule 2003, but would permit the admission of illegally seized evidence in a variety of contexts where probable cause is lacking, so long as the police officer acted in "good faith." In *Leon* itself probable cause was absent entirely, yet illegally seized evidence was admitted into evidence. 468 U.S. at 905, 104 S.Ct. at 3411.

We cannot countenance such a wide departure from the text and history of Article 1, Section 8, nor can we permit the use of a "good faith" exception to effectively nullify Pa.R.Crim.P. 2003. Our Constitution requires that warrants shall not be issued except upon probable cause. We have specifically adopted Rule 2003 for the purpose of confining the probable cause inquiry to the written affidavit and warrant, in order to avoid any doubt as to the basis for

---

**13.** *See also Commonwealth v. Geary,* 488 Pa. 174, 411 A.2d 1195 (1980). In *Geary,* we described the history of Article I, Section 8, and explained why oral testimony was not prohibited by the Constitution in making a probable cause determination with respect to *arrest warrants,* even though Rule 2003 mandated such a result with respect to *search warrants.* *Geary* is significant in that it expressly reaffirms *Milliken* and Rule 2003. Three members of the present court—Chief Justice Nix, Justices Larsen and Flaherty—joined the majority in *Geary,* citing Rule 2003 approvingly for the proposition that "all information used to supply probable cause for a search warrant must be in the affidavit ..." *Id.,* 488 Pa. at 177–178, 411 A.2d at 1197.

probable cause. We decline to undermine the clear mandate of these provisions by slavishly adhering to federal precedent where it diverges from two hundred years of our own constitutional jurisprudence.[14]

A second policy consideration which bolsters our conclusion is that the underlying premise of *Leon* is still open to serious debate. Although it is clear that the exclusionary rule presents some cost to society, in allowing "some guilty defendants (to) ... go free," *Leon*, 468 U.S. at 907, 104 S.Ct. at 3412, the extent of the costs are far from clear. A number of recent studies have indicated that the exclusion

**14.** Our holding today is in no way meant to conflict with this Court's decision in *Commonwealth v. Mason*, 507 Pa. 396, 490 A.2d 421 (1985). In *Mason*, this Court held that not every perceived violation of the Pennsylvania Rules of Criminal Procedure requires the automatic exclusion of evidence seized. In that case, a putative violation of Pa. Rule of Criminal Procedure 2004 ("A search warrant shall be served by a law enforcement officer") was held insufficient to jusitify the exclusion of evidence, where probable cause was clearly established and a proper warrant issued. (The Court ultimately concluded in *Mason* that Rule 2004 had not been violated). In the opinion authored by Mr. Justice Larsen, this Court emphasized that nothing in the history of the Rules themselves, or related case law, mandated that every violation of the Rules of Criminal Procedure—however technical—required exclusion of evidence seized in the process. *See, e.g., Commonwealth v. Johnson*, 315 Pa.Super. 579, 462 A.2d 743 (1983) (violation of Rule 2003(c) regarding nighttime searches does not require exclusion of evidence seized). Rather, as Mr. Justice Larsen explained, it is only where the violation "implicates fundamental, constitutional concerns ..." that exclusion may be appropriate. *Id.* 507 Pa. at 407, 490 A.2d at 426.

For example, in *Commonwealth v. Chandler*, 505 Pa. 113, 477 A.2d 851 (1984), where a magistrate did not sign a warrant form indicating that he had made a determination of probable cause, this Court found that the error was one of constitutional dimension, since it went to the very issue of probable cause. Therefore, evidence seized pursuant to the defective warrant was properly suppressed.

In the instant case, as in *Chandler,* the defect was clearly one of constitutional proportions, going to the lack of probable cause on the face of the affidavit and search warrant. More significantly, we are not here excluding evidence simply because a technical violation of a Rule has occurred; unlike *Mason,* probable cause is lacking on the face of the warrant. We reaffirm the principle of *Mason* that not all technical violations of the Rules of Criminal Procedure—standing alone—automatically require exclusion of evidence. However, where a Rule is violated and the end result is a lack of probable cause or some other fundamental defect in the warrant, nothing in *Mason* is

of illegally seized evidence has had a marginal effect in allowing guilty criminals to avoid successful prosecution.[15] Indeed, the *Leon* decision itself indicates relatively low statistics with respect to the impact of the exclusionary rule in thwarting legitimate prosecutions.[16] Equally as important, the alternative to the exclusionary rule most commonly advanced—i.e., allowing victims of improper searches to sue police officers directly—has raised serious concern among police officers.[17]

A third policy consideration which compels our decisions is that, given the recent decision of the United States Supreme Court in *U.S. v. Gates, supra*, adopting a "totality of the circumstances test" in assessing probable cause, there is far less reason to adopt a "good faith" exception to the exclusionary rule. We have adopted *Gates* as a matter of Pennsylvania law in the recent case of *Commonwealth*

meant to suggest that such a constitutional infirmity may be overlooked.

**15.** *See* Nardulli, *The Societal Costs of the Exclusionary Rule: An Empirical Assessment*, 1983 A.B. Found. Research J. 585. In this study of nine mid-sized counties in Illinois, Michigan and Pennsylvania, the author found that motions to suppress physical evidence were filed in fewer than five percent (5%) of the 7,500 cases studied, and such motions were successful in only seven-tenths of a percent (0.7%) of all cases. *Id.* at 596.

A 1979 study prepared by the General Accounting Office at the request of Congress reported that only four-tenths of a percent (0.4%) of all cases declined for prosecution by federal prosecutors were declined primarily because of illegal search problems. *See,* Report of the Comptroller General of the United States, *Impact of the Exclusionary Rule on Federal Criminal Prosecutions* 14 (1979). Restated in terms of all arrests, the study shows that only two-tenths of a percent (0.2%) of all felony arrests are declined for prosecution because of potential exclusionary rule problems. *See* Davies, *A Hard Look at What We Know (and Still Need to Learn) About the Costs of the Exclusionary Rule: The NIJ Study and Other Studies of Lost Arrests*, 1983 A.B. Found. Research J. 611, 635. *See, also,* Duke, *Making Leon Worse*, 95 Yale L.J. 1405 (1986).

**16.** *See* 468 U.S. at 907 n. 6, 104 S.Ct. at 3412 n. 6.

**17.** *See* Note, *The Exclusionary Rule and Deterrence: An Empirical Study of Chicago Narcotics Officers*, 54 U.Chi.L.Rev. 1016, 1053 (1987). In a survey of 26 Chicago narcotics officers, all 26 believed that the exclusionary rule was preferable to a system where police officers were sued directly.

*v. Gray, supra.* As a number of jurists have pointed out, the flexible *Gates* standard now eliminates much of the prior concern which existed with respect to an overly rigid application of the exclusionary rule.[18]

Finally, the dangers of allowing magistrates to serve as "rubber stamps" and of fostering "magistrate-shopping," are evident under *Leon.* As the instant case illustrates, police officers and magistrates have historically worked closely together in this Commonwealth. Trooper Deise and District Justice Tlumac prepared the warrant and affidavit with Trooper Deise dictating the affidavit while the magistrate typed it verbatim.

There is no suggestion here that Trooper Deise and District Justice Tlumac acted other than in utmost "good faith" when preparing the warrant. Nevertheless, we are mindful of the fact that both state and federal interpretations of the 4th Amendment require a warrant to be issued by a "neutral and detached magistrate," because as Mr. Justice Papadakos noted, there is a requirement of "an independent determination of probable cause." *Commonwealth v. Smith*, 511 Pa. 36, 41, 511 A.2d 796, 798 *cert. den.*, 479 U.S. 1006, 107 S.Ct. 643, 93 L.Ed.2d 700 (1986), *citing, Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The reason for this requirement is evident. Would the District Justice act as nothing more than an adjunct of the police department, there would be no opportunity for *review* of the warrant prior to its issuance, and hence, a search warrant would be nothing more than the police's own determination of whether probable cause exists. We cannot countenance such a policy as it clearly runs afoul of our historically based system of government; which requires three *independent* branches.

It must be remembered that a District Justice is not a member of the executive branch—the police—but a member of the judiciary. By falling within the judicial branch of government, the District Justice is thus charged with the responsibility of being the *disinterested* arbiter of disputes

18. *See,* 468 U.S. at 958, 104 S.Ct. at 3444 (Brennan, J. dissenting).

and is charged further with acting as the bulwark between the police and the rights of citizens. Unless and until a magistrate *independently* determines there is probable cause, no warrant shall issue.

This is not to say that we distrust our police or district justices; far from it. We, in fact, have no doubt that police officers and district justices in Pennsylvania are intelligent, committed and independent enough to carry out their duties under the scheme which has evolved over the past thirty years, in order to safeguard the rights of our citizens.

However, requiring "neutral and detached magistrates" furthers the twin aims of safeguarding privacy and assuring that no warrant shall issue but upon probable cause. As such, we see no reason to eliminate this requirement, for if we did, we would eviscerate the purpose of requiring warrants prior to searches. As one member of the Mississippi Supreme Court noted in a similar vein: "If it ain't broke, don't fix it." *Stringer v. State, supra,* 491 So.2d at 850.

## CONCLUSION

Thirty years ago, when the exclusionary rule was first introduced, police officers were perhaps plagued with ill-defined, unarticulated rules governing their conduct. However, the past thirty years have seen a gradual sharpening of the process, with police officers adapting well to the exclusionary rule. *See* Note, *The Exclusionary Rule and Deterrence: An Empirical Study of Chicago Narcotics Officers,* 54 U.Chi.L.Rev. 1016 (1987).[19]

**19.** In another study, Professor Loewenthal found "strong evidence that, regardless of the effectiveness of direct sanctions, police officers could neither understand nor respect a court which purported to impose Constitutional standards on the police without excluding evidence obtained in violation of those standards...." *See* Loewenthal, *Evaluating the Exclusionary Rule in Search and Seizure,* 49 UMKC L.Rev. 24, 29–30. This study of New York police officers found that after *Mapp* made police officers aware of the existence of Constitutional rights relating to search and seizure, they viewed the exclusionary rule as an "absolute necessity." *Id.,* at 29. Professor Loewenthal concluded that police officers would view the elimination of the

The purpose of Rule 2003 is not to exclude *bona fide* evidence based upon technical errors and omissions by police officers or magistrates. Rather, Rule 2003 is meant to provide support for the probable cause requirement of Article I, Section 8, by assuring that there is an objective method for determining when probable cause exists, and when it does not.

In the instant case, the evidence seized from defendant Edmunds was the product of a constitutionally defective search warrant. Article I, Section 8 of the Pennsylvania Constitution does not incorporate a "good faith" exception to the exclusionary rule. Therefore, the marijuana seized from the white corrugated building, the marijuana seized from Edmund's home, and the written and oral statements obtained from Edmunds by the troopers, must be suppressed. We base our decision strictly upon the Pennsylvania Constitution; any reference to the United States Constitution is merely for guidance and does not compel our decision. *See Michigan v. Long, supra,* 463 U.S. at 1040–41, 103 S.Ct. at 3476–77.

Justice Brandeis, in his eloquent dissent in *Olmstead v. United States,* 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), reminded us over a half-century ago:

> In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. *Id.* at 485, 48 S.Ct. at 575.

Although the exclusionary rule may place a duty of thoroughness and care upon police officers and district justices in this Commonwealth, in order to safeguard the rights of citizens under Article I, Section 8, that is a small price to pay, we believe, for a democracy.

exclusionary rule as an indication that the Constitutional provision "is not a serious matter, if indeed it applies to them at all." *Id.* at 30.

JUDGMENT OF SENTENCE REVERSED.   Jurisdiction relinquished.

PAPADAKOS, J., files a concurring opinion.

McDERMOTT, J., files a dissenting opinion.

PAPADAKOS, Justice, concurring.

I am compelled to concur in the result because Rule 2003(a) of the Pa. Rules of Criminal Procedure is absolute in requiring that the affidavit of probable cause supporting the issuance of a search warrant must be complete on its face in every essential detail, and that no testimony is permitted after its execution to fill in the blanks.   The affidavit of probable cause in this case clearly lacks the essential element of the date when the informants saw the contraband growing.   Although the affiant orally related to the magistrate, before the preparation of the affidavit of probable cause, the date on which the informants had seen the contraband growing, the magistrate, in acting the role of the scribe in typing the affidavit of probable cause, neglected to include this crucial date and the affiant neglected to spot this omission.

The majority correctly quotes this court's prior pronouncement on the subject:

"After the effective date of the rule the determination of probable cause by a suppression hearing court and an appellate court upon review will be made *only* from the written record prepared contemporaneously with the issuance of the search warrant."

*Commonwealth v. Milliken,* 450 Pa. 310, 314, 300 A.2d 78, 81 (1973), quoted by the majority opinion at p. 405.

In view of the clear, unequivocal command of Rule 2003(a), I see no reason for the majority to reinvent the wheel and re-express the rationale underpinning the judicially created rule of procedure.   It's all been said before.   I see no issue of a good faith exception applicable in this case. I see only a reaffirmation of the dictates of Rule 2003(a) by simple statement to that effect or a change in the rule to

accommodate the error committed by the scribe. Since the majority apparently does not wish to change the rule to avoid the absurdity of excluding the evidence obtained by the police through no misconduct on their part, I see no need for the in-depth re-analysis given by the majority.

Were the rule not so absolute on its face, I would gladly join McDERMOTT, J., in dissent, for my sympathies and reason lie in his expression of outrage in the result of cases such as this.

McDERMOTT, Justice, dissenting.

Today we have abandoned the twenty seven (27) year history of this Court's restrictive use of the exclusionary rule to only those instances where its application would deter misconduct by law enforcement authorities. Now that we have ignored that history and have decided to employ it even in cases where police officers have fulfilled their every obligation to protect the individual constitutional rights of citizens, I dissent.

Until this day we have dutifully followed the canons of the Fourth Amendment prescribed by the Supreme Court of the United States through hundreds of cases. We accepted, as we must, their rationale that police procedures had overstepped constitutional bounds and we imposed the sanction of suppression to dissuade illegal search. *See Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A.2d 304 (1963). To teach the lesson, we were obliged to ignore a mountain of illegal contraband that otherwise was palpable indicia of guilt. There is no doubt that the social cost has been more than criminals freed to try again.[1] It has generated a disbelief and a growing disrespect in the efficacy of law that stands mute in the presence of incontrovertible evi-

---

1. One of those social costs has been the breakdown of the deterrent effect of the criminal law. "[O]ur preoccupation with restriction on police activity has become so great that an impression circulates that the chief end of the criminal law is to prevent invasions by police rather than invasions by criminals. Unquestionably, this preoccupation has lead to the release of patently guilty criminals and thereby weakened the deterrent effect of the criminal law." Fleming, *Of Crimes and Rights,* 150, 151 (1978).

dence of fire and lets the house burn down because the fireman arrived before he was properly called.[2] *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) does not open the gates to unauthorized search, it does not dissolve the need for probable cause. It simply and properly shifts the responsibility for determining probable cause to a neutral magistrate and frees the police of his or her mistakes. The police cannot search on a whim. They must present their cause to a neutral magistrate. The facts they present must be true, the magistrate must act within his bounds, and, as the final test, the police must employ their experience in recognizing whether a warrant is illegal despite the authorization of the magistrate. *Id.* at 923, 104 S.Ct. at 3421. All of these contentions remain alive and subject to scrutiny at a suppression hearing. The instant case is a classic illustration. The defect in the affidavit of probable cause was that the time of the offense was not specified. What was told the magistrate was that the contraband was "growing," a clear indication of present tense. The informants told the police that they saw it growing and the magistrate was told that it was growing and he issued a search warrant on that premise. When the police arrived it was still growing. All concerned acted in good faith. To suppress the evidence because a date was not specified with exactitude under those circumstances dwindles into practiced absurdity.

The United States Supreme Court has made it abundantly clear that suppression of evidence seized without probable cause is not a constitutional right. *Id.* at 906, 104 S.Ct. at

**2.** One rationale, other than deterrence, that has been offered for the use of the exclusionary rule is "the imperative of judicial integrity." *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960). However, this rationale has been criticized because, "The layman finds the judicial integrity rationale difficult to grasp, and many lawyers think the highest integrity of the adjudicative aspect of the criminal process lies in the separation of the guilty from the innocent on the basis of all the relevant evidence available." *Commonwealth v. DeJohn,* 486 Pa. 32, 63, 403 A.2d 1283, 1298 (1979), (Larsen J. dissent) *citing,* McGowan, *Rulemaking and the Police,* 70 Mich.L.Rev. 659, 674 (1972).

3411.[3]  This Court has made that clear as well. *See Commonwealth v. Miller*, 513 Pa. 118, 133–134, 518 A.2d 1187, 1195 (1986) ("[T]he exclusionary rule is a judicially created device designed to deter improper governmental action in the course of criminal investigations and prosecutions. It is not a personal right of the accused").

The United States Supreme Court has made it equally clear that suppression of evidence seized without probable cause is mandated to contain police action. *Leon*, 468 U.S. at 916, 104 S.Ct. at 3417.  Likewise, we have approved the suppression of evidence only where it will have the benefit of deterring similar police misconduct in the future. *Commonwealth v. Corley*, 507 Pa. 540, 491 A.2d 829 (1985); *Commonwealth v. DeJohn*, 486 Pa. 32, 403 A.2d 1283 (1979); *Commonwealth v. Brown*, 470 Pa. 274, 368 A.2d 626 (1976); *Commonwealth v. Platou*, 455 Pa. 258, 312 A.2d 29 (1973); *Commonwealth v. Kates*, 452 Pa. 102, 305 A.2d 701 (1973); and *Commonwealth ex rel. Wilson v. Rundle*, 412 Pa. 109, 194 A.2d 143 (1963).[4]

In interpreting our Constitution we are, as are our sister states, always free to give more than that allowed under Federal Constitutional interpretation. *Commonwealth v. Sell*, 504 Pa. 46, 63, 470 A.2d 457, 467 (1983).  I would choose to accept the rationale of the Supreme Court and recognize the "good faith exception" of *Leon* to the exclusionary rule as have eighteen of our sister states.[5]  My

---

3. *See* also Dripps, *Living with Leon*, 95 Yale L.J. 906, 918–922 (1986).

4. *See* also *Corley*, 507 Pa. at 552, 491 A.2d at 835 (Larsen J., concurring) wherein he states: "Both the United States Supreme Court and this Court have made it clear that the exclusionary rule will not be extended to areas where its application would not tend to achieve its primary purpose of deterring unlawful police conduct." *Citing, inter alia, Commonwealth v. Mason*, 507 Pa. 396, 490 A.2d 421 (1985), and *Commonwealth v. Musi*, 486 Pa. 102, 404 A.2d 378 (1979).

5. Alabama–*Crittenden v. State*, 476 So.2d 632 (1985); Arizona–A.R.S. § 13–3925; Arkansas–*Jackson v. State*, 291 Ark. 98, 722 S.W.2d 831 (1987); California–*In re Lance*, 37 Cal.3d 873, 694 P.2d 744, 210 Cal.Rptr. 631 (1985) (by statute, California has mandated the use of all relevant evidence, even if unlawfully seized, to the extent the admission of that evidence is permitted by the U.S. Constitution); Colorado–(Statute) Colo.Rev.Stat. § 16–3–308 (1986); Florida–*Bernie v. State*, 524 So.2d 988 (1988); Idaho–*State v. Prestwich*, 116 Idaho 959, 783

opinion is not merely grounded in the absurdity of excluding this evidence, nor only upon the persuasiveness of *Leon*, but also because it is firmly grounded in Pennsylvania jurisprudence.

In *Commonwealth ex rel Wilson v. Rundle, supra,* the defendant, in a *habeas corpus* petition, contended that the admission into evidence at his trial of $100.00 bills in U.S. currency and their serial numbers, seized from his person and hotel room in Las Vegas without a search warrant, was improper and that he should be awarded a new trial. The defendant's judgment of sentence had become final prior to the *Mapp* decision, and therefore the Court was obligated to address whether *Mapp* should be applied retrospectively.

In deciding the issue, the Court stated that "we must understand the basic purpose in the mandate of the court in *Mapp.*" The Court answered this question by citing *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960): "The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Rundle,* 412 Pa. at 118, 194 A.2d at 148. The Court continued that "This rule of exclusion is essentially a rule of evidence, even though of constitutional dimensions. In excluding illegally obtained evidence, the purpose is not to exclude such evidence because it is testimonially untrustworthy or lacking in reliability but to discourage police officials from conduct in violation of the Constitution." *Id.,* 412 Pa. at 120, 194 A.2d at 148. The Court concluded that to apply the exclusionary rule retrospectively to the case would not

P.2d 298 (1984); Illinois–*People v. Stewart,* 104 Ill.2d 463, 85 Ill.Dec. 422, 473 N.E.2d 1227 (1984); Indiana–*Blalock v. State,* 483 N.E.2d 439 (1985); Louisiana–*State v. Matthieu,* 506 So.2d 1209 (1987); Maryland–*Chase v. State,* 309 Md. 224, 522 A.2d 1348 (1987); Missouri–*State v. Brown,* 708 S.W.2d 140 (1986); Nevada–*Barrett v. State,* 775 P.2d 1276 (1989); Ohio–*State v. Wilmoth,* 22 Ohio St.3d 251, 490 N.E.2d 1236 (1986); South Dakota–*State v. Saiz,* 427 N.W.2d 825 (1988); Texas–*Curry v. State,* 780 S.W.2d 825 (1989); Virginia–*McCary v. Commonwealth,* 228 Va. 219, 321 S.E.2d 637 (1984); Wyoming–*Patterson v. State,* 691 P.2d 253 (1984), *cert. denied sub nom. Spoon v. Wyoming,* 471 U.S. 1020, 105 S.Ct. 2048, 85 L.Ed.2d 311 (1985).

satisfy the purpose of the rule, and therefore, the judgment of sentence should be affirmed.

In *Commonwealth v. Corley, supra,* this Court refused to employ the exclusionary rule to cases where a citizen makes an arrest and search because, "the exclusionary rule is designed to prevent, not to repair, and is aimed at official misconduct, it would be a wholly improper extension to apply it here, as a remedy for private conduct." *Id.* 507 Pa. at 551, 491 A.2d at 834. In *Commonwealth v. Brown, supra,* we held that where evidence is the "fruit" of evidence obtained as a result of illegal police activity, but it "would have been discovered in the course of a lawfully conducted investigation, no purpose is served in applying the exclusionary rule," because the initial taint did not effect the reliability of the evidence and excluding the evidence would not discourage unlawful police practices. *Id.* 470 Pa. at 284, 368 A.2d at 631.

Most recently, in *Commonwealth v. Melilli,* 521 Pa. 405, 555 A.2d 1254 (1989) we held that a pen register device could not be installed unless probable cause to do so was established. We concluded that evidence seized by the installation of pen registers without probable cause, even though the police reasonably relied upon the Federal standard,[6] should nevertheless be suppressed. We explicitly did not disagree with the *Leon* decision. Instead, we determined that the evidence was appropriately suppressed because the judge who issued the order to install the pen registers [7] never considered whether probable cause existed and thereby "wholly abandoned his judicial role," a situation "envisioned" by *Leon* as worthy of suppression. *Id.,* 521 Pa. at 420, 555 A.2d at 1262.

6. *See Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) which held that the use of pen registers did not constitute a search, and therefore, the use of pen registers did not require a prior showing of probable cause. At the time the pen registers were installed in the *Melilli* case, Pennsylvania had not spoken to the need to show probable cause prior to the installation of pen registers.

7. The orders for pen registers were obtained because Bell Telephone Company refused installation without prior court authorization.

To now reject the holding of *Leon* for Pennsylvania is mere fiat, an exercise of personal illumination about a need for protection not only from the police but from the judiciary. Like the United States Supreme Court, I find no evidence that the judiciary has run beyond its responsibilities, or that if they do we cannot correct them. *See Melilli, supra.* The Supreme Court of the United States is a world landmark for the protection of constitutional rights. What they require we enforce; what they allow we ought not deter except upon clear evidence of positive need. The United States Supreme Court has recognized a positive need to allow, under the canons of *Leon,* a good faith exception. To do otherwise is to provide a sanctuary for the lawless elements seeking profit, particularly in the growing human misery of addiction. With all the consequent losses from the ability to plot, plan and accomplish what common sense, if not common decency, requires be brought to justice because the evidence is real, present, palpable and beyond contradiction.

I would affirm the Superior Court.