J.S20038/14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ABDURRAHMAN MAMDOUH, | : | |
| | : | |
| Appellee | : | No. 1579 WDA 2013 |

Appeal from the Order September 4, 2013
In the Court of Common Pleas of Erie County
Criminal Division No(s).: CP-25-CR-0003337-2012
CP-25-CR-0003338-2012
CP-25-CR-0003339-2012

BEFORE: GANTMAN, P.J., DONOHUE, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.: **FILED SEPTEMBER 10, 2015**

We granted reconsideration in light **Commonwealth v. Gary**, 91 A.3d 102 (Pa. 2014), which the Pennsylvania Supreme Court decided after we previously issued a judgment order in this matter. The Commonwealth originally took this appeal from the order of the Erie County Court of Common Pleas suppressing evidence against Appellee, Abdurrahman Mamdouh, asserting it was not required to establish exigent circumstances to support a warrantless search of a motor vehicle. We now address the

---

[*] Former Justice specially assigned to the Superior Court.

appeal in light of **Gary**,[1] and conclude that further proceedings are required to determine whether an officer properly developed probable cause to search a vehicle. Accordingly, we vacate the trial court's order and remand for further proceedings consistent with this memorandum.

The trial court summarized its factual findings as follows:

On the night of October 4, 2012, [Appellee] and three others drove through Erie's West Side to buy cigarettes. Afterwards, as they drove down Brown Avenue, [Appellee] told the driver to stop their car, a Jeep Cherokee. Once the car had stopped, [Appellee] stepped out, pulled out a BB gun, and approached a pedestrian on the street. He pointed the gun at the pedestrian and demanded all of the pedestrian's possessions. One of the other passengers exited the car and searched the pedestrian's pockets. When the search was finished, and [Appellee] and the passenger reentered the car with the pedestrian's cell phone and wallet, they proceeded to a restaurant. On the way there, [Appellee] once again told the driver to stop, and the driver did so. [Appellee] exited the car and moved out of sight. Five minutes later he returned holding a cell phone and ear buds, and declared that he had just robbed a person.

Two days later, in the early morning hours of October 6, 2012, [Appellee] drove Edin Kantarevic (hereinafter "Edin") and another passenger in the same Jeep Cherokee to a beer distributor. As they passed Coach's Tavern at 38th and Raspberry, they became aware of a visibly intoxicated man standing near the entrance to the bar. [Appellee] handed Edin the BB gun and stopped the car. He then told Edin to hit the man and rob him, and when Edin expressed that he did not want to, [Appellee] taunted and pressured Edin. Eventually, Edin exited the car and pointed the gun at the man. The other passenger got out of the car and searched the man's pockets, where he found

---

[1] We did not order the filing of new briefs.

a wallet and a cell phone. They took those items, reentered the car, and drove away.[2]

About that time, Officers [David] Stucke and Szoszorkek[3] of the Erie Police Department received a call of an armed robbery at Coach's Bar involving a 1990s model black Jeep Cherokee. They began searching that area for the suspect vehicle before going to the 3600 block of Post Avenue because another police officer had previously told Officer Stucke that a vehicle matching this description had been seen there. Further, one of the residents at that address was known to be an Iraqi male and the description of some of the actors in the Coach's robbery included Iraqi or Arabic males. As soon as the officers turned onto Post Avenue, they saw a Jeep Cherokee that perfectly fit the description of the suspect vehicle parked in a driveway. The windows were fogged over and the officers could not tell if occupants were inside. When another unit had arrived for support, the officers approached the Cherokee cautiously and found it to be unoccupied, though the hood above the radiator was warm, indicating it had been recently driven. Officer Stucke looked in a front window and saw an ID card and bank cards on the passenger side floor boards. At this point, ownership of the vehicle had not been identif[i]ed using the license plate number by the dispatcher due to an error with the identifying system. Unsure of what to do, and feeling exposed in the presence of possible armed robbers, Officer Stucke chose to enter the vehicle and look for a registration to ascertain the owner of the vehicle. He found none, but an examination of the ID card on the floorboard showed the card belonged to the victim of the

---

[2] The trial court, in the first two paragraphs recited above, relied on the transcript of the preliminary hearing in this matter. However, a transcript of the preliminary hearing was not included in the certified record or the reproduced record in this appeal. We include these paragraphs from the trial court's opinion for the purposes of context to the trial court's suppression ruling. We offer no comment upon the validity of the allegations set forth in the first two paragraphs.

[3] Neither a first name, nor a correct spelling of Officer Szoszorkek's last name is apparent from the record.

Coach's Tavern incident. Stemming from that discovery, Patrolman Stucke radioed for assistance, and [Appellee] and numerous other young men and women were removed from the house on Post Avenue. The police searched the house pursuant to a search warrant granted due to the evidence in the vehicle, and the search garnered goods stolen in two armed robberies which had occurred on the night of October 4, 2012 as well as BB gun handguns which looked identical to actual firearms. The officers detained all the occupants of the house, including [Appellee], at the police station to interview them. [Appellee] was eventually charged with counts stemming from all three armed robberies.

Trial Ct. Op., 9/4/13, at 1-4 (record citations omitted).

Appellee, on April 30, 2013, filed an omnibus pretrial motion seeking, *inter alia*, suppression of all evidence obtained by the police. The motion stated, in relevant part:

7. [Officer] Stucke was driving around the area when he viewed a parked Jeep Cherokee in the driveway of a residence where [Appellee] and several other of the individuals implicated herein were living . . . at approximately 0148 hours.

8. [Officer] Stucke entered onto the private property, went to the vehicle in the driveway and finding the door unlocked, entered the vehicle. While searching the vehicle, the [officer] first searched the glove box for vehicle registration, then . . . picked up a pile of cards, etc., from the floor of the front passenger area which included the ID of the alleged victim [of the October 6, 2012 robbery].

\* \* \*

WHEREFORE, [Appellee] respectfully requests that this Honorable Court schedule an evidentiary hearing and . . . enter an Order suppressing any and all physical evidence seized from the vehicle illegally entered at [Appellee's residence] . . . .

Appellee's Omnibus Pre-Trial Mot. & Pet. for Habeas Corpus, 4/30/13, at 3-5 (unpaginated).

The trial court held a hearing on Appellee's omnibus pretrial motion on June 3, 2013, and issued its ruling granting Appellee's suppression motion on September 4, 2013. The court concluded Officer Stucke had probable cause to search the Jeep Cherokee, but suppressed the evidence under pre-*Gary* law, concluding the officer's search of the vehicle was not accompanied by exigent circumstances. Trial Ct. Op. at 5-7. The Commonwealth took this appeal.[4]

This Panel, on April 23, 2014, previously affirmed the order granting suppression. However, six days after our decision, on April 29th, the Pennsylvania Supreme Court decided *Gary*. The Commonwealth timely filed a motion for reargument or reconsideration on May 7th, and this Panel granted reconsideration without ordering new briefs.

The Commonwealth has presented the following question on appeal:

> Whether the appropriate standard when evaluating warrantless vehicle searches should require either probable cause alone or probable cause which arose unexpectedly in circumstances that prevented police from securing a warrant in advance?

Commonwealth's Brief at 3.

---

[4] The Commonwealth filed a timely notice of appeal with a separate certification that the trial court's ruling terminated or substantially handicapped the prosecution. *See* Pa.R.A.P. 311(d). The trial court did not order the filing of a Pa.R.A.P. 1925(b) statement.

The Commonwealth's sole contention is that exigent circumstances should not be required when considering a search of an automobile. *Id.* at 6. According to the Commonwealth, "The approach in Pennsylvania [to search a vehicle] should be coextensive with the federal approach **under the Fourth Amendment** . . . requiring only probable cause." *Id.* at 10 (citation omitted) (emphasis in original).

*Gary* decided in favor of a similar argument while this appeal was pending, and held that in Pennsylvania, exigent circumstances are no longer required to justify a search of an automobile. *See Gary*, 91 A.3d at 112. Having reviewed the parties' arguments in light of the relevant law and the record, we conclude *Gary* itself does not entitle the Commonwealth to relief in this matter. Rather, our review reveals outstanding issues regarding the trial court's determination that the officer lawfully obtained probable cause to enter the vehicle. Accordingly, we vacate the trial court's order and remand for further consideration.

Our standard of review is as follows:

> When reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate. Where the defendant prevailed in the suppression court, we may consider only the evidence of the defense and so much of the evidence for the Commonwealth as remains uncontradicted when read in the context of the record as a whole. Where the appeal of the determination of the suppression court turns on allegations of legal error, "the suppression court's conclusions of law are not binding on

an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts."

***Commonwealth v. Peterson***, 17 A.3d 935, 937 (Pa. Super. 2011) (citations omitted). Once a suppression issue is properly raised, the Commonwealth bears the burden of proving the subject evidence was legally obtained. ***Commonwealth v. Enimpah***, 62 A.3d 1028, 1031 (Pa. Super. 2013), *aff'd* 106 A.3d 695 (Pa. 2014); ***see also*** Pa.R.Crim.P. 581(D), (H). This Court may affirm the trial court's suppression ruling on any basis. ***Commonwealth v. McCulligan***, 905 A.2d 983, 988 (Pa. Super. 2006).

Preliminarily, we note:

> The general rule followed in Pennsylvania is that we apply the law in effect at the time of the appellate decision. This principle applies with equal force to both civil and criminal proceedings. This means that we adhere to the principle that, "a party whose case is pending on direct appeal is entitled to the benefit of changes in law which occurs before the judgment becomes final." . . . [A]t common law, a decision announcing a new principle of law is normally retroactive. [A]lthough retroactivity is the general rule, a sweeping rule of retroactive application is not justified. Retrospective application is a matter of judicial discretion which must be exercised on a case by case basis.

***Blackwell v. State Ethics Comm'n***, 589 A.2d 1094, 1099 (Pa. 1991) (citations omitted); ***see also Commonwealth v. Gray***, 503 A.2d 921, 926-27 (Pa. 1985) (holding this Court did not err in retroactively applying "common–sense, practical approach" to probable cause standards when affirming trial court's denial of suppression motion). "However, it is well-settled that in order for a new law to apply retroactively to a case pending

on direct appeal, the issue had to be preserved in the trial court and at all subsequent stages of the adjudication up to and including the direct appeal." **Commonwealth v. Smith**, 17 A.3d 873, 893-94 (Pa. 2011) (citations omitted).

It appears **Gary** applies retroactively to cases that were decided under pre-**Gary** law and are pending on direct appeal. **See Commonwealth v. Dunn**, 95 A.3d 272 (Pa. 2014) (*per curiam*) (vacating Superior Court decision and remanding in light of **Gary**). We recognize, however, that the Commonwealth did not reserve an objection or claim it was not required to establish exigent circumstance until this appeal.[5] **See** Commonwealth's Brief at 3. Nevertheless, under the circumstances of this case, an objection to the pre-**Gary** state of the law would have been futile and does not require waiver. **See Cleveland v. Johns-Manville Corp.**, 690 A.2d 1146 , 1151 (Pa. 1997) ("where a fundamental change in the law occurs after the lower court enters its order, but before the appellate court rules, the failure to

---

[5] Instantly, Appellee properly preserved his suppression challenges in his omnibus pretrial motion and the Commonwealth attempted to carry its burden of proof under pre-**Gary** law by adducing evidence of exigent circumstances. **See** Pa.R.Crim.P. 581(D), (H). The Commonwealth did not expressly object to the law in existence at the time of the suppression hearing. Rather, the trial court first suggested the possibility of a change in the application of the law in its opinion in support of suppression. **See** Trial Ct. Op. at 7 n.2 ("The requirement of exigent circumstances may be ripe for appellate review . . . ."). The Commonwealth, in turn, claimed that it was not required to establish exigent circumstance for the first time on appeal. **See** Commonwealth's Brief at 3.

raise the issue in the lower court will not preclude appellate review of that issue"); **Commonwealth v. Cheeks**, 239 A.2d 793, 796 (Pa. 1968) ("It would be manifestly unfair to hold [an] appellant to a waiver when this waiver is alleged to have occurred at a time when neither the defendant nor his attorney had any way of knowing that there existed a right to be waived")  Thus, we conclude **Gary** applies retroactively in this matter and will not find the issue waived.  **Cf. Gray**, 503 A.2d at 926-27.

The Pennsylvania Supreme Court decision in **Gary**[6] addressed a divergence between Pennsylvania law and the decisions of the United States Supreme Court regarding warrantless automobile searches.  **Gary**, 91 A.3d at 120.  Prior to **Gary**, Pennsylvania courts applied a "limited automobile exception," which required the Commonwealth to establish probable cause **and exigent circumstances** to justify a warrantless search of a motor vehicle.  United States Supreme Court precedent on the Fourth Amendment, however, developed to permit a warrantless search of an automobile based on probable cause alone.  **Id.** at 119-20.  The **Gary** Court noted,

> [T]here has been an evolution of the high Court's
> jurisprudence concerning the automobile exception to the

---

[6] Justice McCaffery authored the lead decision in **Gary**, which was joined by Chief Justice Castille and Justice Eakin.  Justice Saylor filed a concurring opinion.  Justice Todd filed a dissenting opinion that was joined by Justice Baer.  Justice Orie Melvin did not participate in the decision.  Although issued as an Opinion Announcing the Judgment of the Court, four Justices agreed upon the essential holding that only probable cause was required to search a motor vehicle.  **See id.**; **id.** at 138 (Saylor, J., concurring).

warrant requirement. While the early holdings of [***Carroll v. United States***, 267 U.S. 132 (1925),] and [***Chambers v. Maroney***, 399 U.S. 42 (1970),] relied on the impracticability of obtaining a warrant for a motor vehicle in transit with contraband or evidence of a crime, more recent cases from the high Court have made clear that the impracticability of obtaining a warrant, unforeseen events, or any other exigent circumstances—beyond the inherent ready mobility of a motor vehicle—are not required for application of the automobile exception to the warrant requirement. As the high Court stated in [***Maryland v. Dyson***, 527 U.S. 465, 466–67 (1999)], since 1982, the **only** requirement for application of the automobile exception, permitting warrantless search of a motor vehicle under federal law, is a finding of probable cause.[7]

---

[7] We are mindful that litigants and our sister courts continue to refer to ***Coolidge v. New Hampshire***, 403 U.S. 443 (1971), to suggest a search of a vehicle is held to differing standards when the vehicle is found on public versus private property. ***See e.g.***, ***United States v. Fields***, 456 F.3d 519, 525 (5th Cir. 2006) (distinguishing ***Coolidge*** by noting, "The Fourth Amendment concerns that arise when the police search a car that is parked in the driveway of a home, without a warrant, are not present here."). Although not expressly abrogated, the rationale of ***Coolidge*** has been undercut by more recent United States Supreme Court decisions. ***See Dyson***, 527 U.S. at 466–67 (1999); ***United States v. Smith***, 533 F. Supp. 2d 227, 232-33 (D. Mass. 2008); ***see also Gary***, 91 A.3d at 112. Moreover, as the ***Smith*** court observed, there are several decisions of the United States Circuit Courts of Appeals applying the "automobile exception" to unoccupied vehicles in private driveways. ***Smith***, 533 F.Supp. 2d at 233 (citing ***United States v. Hines***, 449 F.3d 808 (7th Cir. 2006); ***United States v. Brookins***, 345 F.3d 231 (4th Cir. 2003); ***United States v. Fladten***, 230 F.3d 1083 (8th Cir. 2000); ***United States v. Markham***, 844 F.2d 366 (6th Cir. 1988); ***United States v. Hamilton***, 792 F.2d 837 (9th Cir. 1986)); ***see also Pennsylvania v. Labron***, 518 U.S. 938 (1996) (*per curiam*). The court, however, also observed other Circuit Courts of Appeals suggest a "heightened privacy interests may be triggered when a vehicle is encountered on private property." ***Smith***, 533 F. Supp. 2d at 232-33 (quoting ***Brookins***, 345 F.3d at 237 n.8, and citing ***Fields***, 456 F.3d at 525). In light of ***Gary***, we decline to consider whether greater privacy interests attach to an unoccupied vehicle on a residential driveway.

*Id.* at 112.

The *Gary* Court determined prior Pennsylvania courts did not thoroughly inquire as to whether greater protections were required by Article I, Section 8 of the Pennsylvania Constitution. *Id.* at 120. The *Gary* Court conducted an *Edmunds*[8] analysis and announced:

> [W]e now hold that with respect to a warrantless search of a motor vehicle that is supported by probable cause, Article I, Section 8 of the Pennsylvania Constitution affords no greater protection than the Fourth Amendment to the United States Constitution. Accordingly, we adopt the federal automobile exception to the warrant requirement, which allows police officers to search a motor vehicle when there is probable cause to do so and does not require any exigency beyond the inherent mobility of a motor vehicle.

*Gary*, 91 A.3d at 104. It further stated:

> The prerequisite for a warrantless search of a motor vehicle is probable cause to search; no exigency beyond the inherent mobility of a motor vehicle is required. The consistent and firm requirement for probable cause is a strong and sufficient safeguard against illegal searches of motor vehicles, whose inherent mobility and the endless

---

[8] *Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991). An *Edmunds* analysis pertains to whether the Pennsylvania Constitution provides greater protection than the United States Constitution and

encompasses at least the following four factors:

> 1) text of the Pennsylvania constitutional provision; 2) history of the provision, including Pennsylvania case-law; 3) related case-law from other states; [and] 4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence.

*Gary*, 91 A.3d at 124 (citation omitted).

> factual circumstances that such mobility engenders constitute a *per se* exigency allowing police officers to make the determination of probable cause in the first instance in the field.

***Id.*** at 138.

In aligning Pennsylvania law with the federal automobile exception, the ***Gary*** Court referred to several policy considerations. For example, the Court noted that a finding of exigent circumstances "often turned on small details in the midst of a complex factual scenario, details which have been given varying emphasis over time by different members of this Court." ***Id.*** at 137. The Court suggested, "To provide greater uniformity in the assessment of individual cases and more consistency with regard to the admissibility of the fruits of vehicular searches based on probable cause, a more easily applied rule—such as that of the federal automobile exception— is called for." ***Id.*** (citation omitted).

In light of ***Gary***, the trial court's reason for suppressing the evidence in this case—*i.e.*, that probable cause existed to search the vehicle, but exigent circumstances did not—no longer comports with the law of Pennsylvania. ***See id.*** at 104; ***accord Dunn***, 95 A.3d at 272; ***Gray***, 503 A.2d at 926-27. However, because this Court may affirm on any basis apparent in the record, ***see McCulligan***, 905 A.2d at 988, we review the trial court's determination that the officer possessed probable cause to search the vehicle.

The following principles govern our review. "Probable cause" is defined as information that permits a "'neutral' and 'detached'" determination that (1) criminal activity occurred and (2) "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Commonwealth v. Woosnam*, 819 A.2d 1198, 1208 (Pa. Super. 2003) (citation omitted).

> In determining whether probable cause exists, we must consider the totality of the circumstances as they appeared to the arresting officer. Additionally, "[t]he evidence required to establish probable cause for a warrantless search must be more than a mere suspicion or a good faith belief on the part of the police officer."

*Commonwealth v. Copeland*, 955 A.2d 396, 400 (Pa. Super. 2008) (citations omitted). "[W]hat facts and circumstances amount to probable cause is a question of law." *Commonwealth v. Newman*, 84 A.3d 1072, 1079 (Pa. Super. 2014) (citation omitted), *appeal denied*, 99 A.3d 925 (Pa. 2014).

A "search" occurs when "the Government obtains information by physically intruding" on a constitutionally protected area. *Commonwealth v. Sodomsky*, ___ A.3d ___, ___, 2015 WL 3533863, at *6 (Pa. Super. June 5, 2015) (citation omitted). This Court has stated:

> Absent probable cause and exigent circumstances, warrantless searches and seizures in a private home violate both the Fourth Amendment and Article 1 § 8 of the Pennsylvania Constitution. These constitutional protections have been extended to the curtilage of a person's home. In determining what constitutes "curtilage," we consider "factors that determine whether

> an individual reasonably may expect that an area immediately adjacent to the home will remain private. Curtilage is entitled to constitutional protection from unreasonable searches and seizures as a place where the occupants have a reasonable expectation of privacy that society is prepared to accept."

*Commonwealth v. Bowmaster*, 101 A.3d 789, 792 (Pa. Super. 2014) (citations omitted).

In *Commonwealth v. Gibbs*, 981 A.2d 274 (Pa. Super. 2009), this Court held that a front porch to a residence was not constitutionally protected. *Id.* at 280. In that case, police officers conducted an undercover investigation of drug sales at the defendant's residence. *Id.* at 277. A confidential informant arranged for a third-party purchase of crack cocaine. *Id.* The third-party entered the defendant's home and purchased drugs from an individual. *Id.* Officers arrested the purchaser as he was leaving the scene and seized the narcotics in his possession. *Id.* An officer applied for a search warrant, but concerned evidence would be destroyed, directed other officers to distract the occupants of the residence by knocking on the door and engaging them in conversation. *Id.* The remaining officers entered onto the porch, at which time the defendant opened the front door. *Id.* at 277-78. "From their vantage point on the porch, the officers observed stacks of cash and bags of apparent crack cocaine on the kitchen counter within two or three feet of" the defendant. *Id.* at 278.

The defendant in *Gibbs* was convicted of drug trafficking offenses and took an appeal to this Court asserting, *inter alia*, "[t]he front porch

constituted curtilage and thus the police viewed the contraband from an unlawful vantage point." *Id.* at 278-89. The *Gibbs* Court concluded:

> There is no evidence in the record, and [the defendant] has provided no legal support for his claim that the porch constituted curtilage. The evidence established that there was no front yard or other enclosed space preceding or surrounding the porch; rather, the porch "butt[ed] up" against the sidewalk. There was no gate blocking entry to the porch and nothing else which would indicate that the porch was closed to members of the general public. Further, the porch was an empty, unenclosed, concrete slab that was used by deliverymen and visitors to the apartment. Lastly, the evidence reflects that, within minutes of the police entry onto the porch, the porch was also used by a pizza deliveryman and a couple of individuals attempting to purchase contraband.

*Id.* at 280 (citations omitted).

In *Commonwealth v. Simmen*, 58 A.3d 811 (Pa. Super. 2012), this Court subsequently held that a defendant did not have a reasonable expectation of privacy in his driveway. *Id.* at 815. In *Simmen*, the defendant crashed into the retaining wall at the complainant's residence, which was approximately one-and-a-half to two miles away from the defendant's home. *Id.* at 813. The complainant called 911 to report the accident, and an officer arrived five minutes later. *Id.* The officer observed a burgundy bumper at the scene and a trail of fluid leading away from the scene. *Id.* The officer followed the trail to the defendant's residence and saw a burgundy vehicle in the driveway, approximately twenty feet from the road. *Id.* The officer then "walked up the driveway," and noticed that the vehicle was leaking fluid, its bumper was missing, and its airbag was

deployed. *Id.* The officer knocked on the front door of the residence and was permitted into the residence by the defendant's wife. The officer ultimately encountered and later arrested the defendant for driving under the influence. *Id.*

After his conviction for driving under the influence and related offenses, the defendant in *Simmen* appealed to this Court asserting, in relevant part, that the "arresting officer unlawfully entered his property by walking up his driveway without a warrant." *Id.* at 815. The *Simmen* Court, citing *Gibbs*, concluded the defendant's driveway was not curtilage. *See id.*

> Based on the description of the driveway, and the location of the car on it, there was no evidence presented at the time of the suppression hearing to support an assertion that there was any expectation of privacy in the area. The driveway was in the front of the house, leading from the street to the garage contained within the actual residence. The car was parked in plain view of the street on the driveway, within twenty (20) feet of the road. There was no evidence of signs warning against trespass on the driveway or that the driveway was gated or fenced or shielded from the view of the street in any way. In fact, it appears from the description of the house that access to the front door of the residence was made via the driveway. . . .
>
> As [the defendant's] driveway was accessible to the general public, [the officer] viewed [the defendant's] vehicle from a lawful vantage point when he walked up [the defendant's] driveway, an area in which [the defendant] did not have a reasonable expectation of privacy.

*Id.* at 815-16 (citations omitted).

Although **Gibbs** and **Simmen** focused on a defendant's reasonable expectation of privacy in a front porch and driveway, respectively, the United States Supreme Court, in 2012, "rediscover[ed] the trespassory origins of the Fourth Amendment." **See Sodomsky**, 2015 WL 3533863 at *6 (citation omitted). In **United States v. Jones**, 132 S. Ct. 945 (2012), the United States Supreme Court discussed "constitutionally protected areas" as follows:[9]

> Consistent with this understanding, our Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century. . . . .
>
> Our later cases, of course, have deviated from that exclusively property-based approach. In **Katz v. United States**, 389 U.S. 347, 351 . . . (1967), we said that "the Fourth Amendment protects people, not places," and found a violation in attachment of an eavesdropping device to a public telephone booth. Our later cases have applied the analysis of Justice Harlan's concurrence in that case, which said that a violation occurs when government officers violate a person's "reasonable expectation of privacy."
>
> . . . Fourth Amendment rights do not rise or fall with the **Katz** formulation. At bottom, we must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." As explained, for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ("persons, houses, papers, and effects") it enumerates. **Katz** did not repudiate that understanding. . . .

---

[9] In **Jones**, the Court considered whether attaching a GPS tracking device to the defendant's vehicle constituted a search. **Jones** 132 S. Ct. at 948. **Jones** was decided on January 23, 2012, after we decided **Gibbs**, but before we decided **Simmen** and the suppression proceedings in this case.

*Jones*, 132 S. Ct. at 950 (citations and footnote omitted).

Following *Jones*, the United States Supreme Court decided *Florida v. Jardines*, 133 S. Ct. 1409 (2013).[10]  In *Jardines*, law enforcement officials "received an unverified tip" that the defendant was growing marijuana in his home.  *Id.* at 1413.  Officers surveilled the residence for fifteen minutes and observed no activity.  *Id.*  An officer then approached the front porch of the residence with a trained police dog, which smelled narcotics.  *Id.*  The canine went to the base of the front door and sat down, which signaled the odor's strongest point.  *Id.*  The officer obtained a search warrant based on this information, executed the warrant, and discovered marijuana plants in the home.  *Id.*  The Florida trial court suppressed the plants, concluding the officers engaged in an unreasonable search, and the Florida Supreme Court ultimately upheld the trial court's decision.  *Id.*  The State appealed the decision to the United States Supreme Court.  *Id.*

The lead opinion in *Jardines* found the case was "a straightforward one," in light of *Jones* and the principle that *Katz* "does not subtract anything from the Amendment's protections 'when the Government **does**

---

[10] *Jardines* was decided on March 26, 2013, after we decided *Gibbs* and *Simmen*, but one month before Appellee filed his suppression motion and two months before the suppression hearing.

engage in [a] physical intrusion of a constitutionally protected area.'"[11] *Id.* at 1414 (citation and quotation marks omitted). The lead opinion concluded, "The front porch is a classic exemplar of an area adjacent to the home and to which the activity of home life extends." *Id.* at 1415 (citation omitted).

> We therefore regard the area "immediately surrounding and associated with the home"—what our cases call the curtilage—as "part of the home itself for Fourth Amendment purposes." That principle has ancient and durable roots. Just as the distinction between the home

---

[11] Justice Scalia authored the lead opinion in *Jardines*, and was joined by Justice Thomas. Justice Kagan authored a concurring opinion, in which Justice Ginsburg and Justice Sotomayor joined. The concurring opinion noted that although the lead opinion decided the case under a "property rubric," the Court could have done so by examining the defendant's "privacy interests." *Id.* at 1418 (Kagan, J., concurring). Under the latter approach, the concurring opinion concluded that a

> "firm" and "bright" rule governs this case: The police officers here conducted a search because they used a "device . . . not in general public use" (a trained drug-detection dog) to "explore details of the home" (the presence of certain substances) that they would not otherwise have discovered without entering the premises.

*Id.* at 1419. The concurring opinion, however, stated it "joined the Court's opinion in full," but "that a focus on [the defendant's] privacy interest would make an 'easy cas[e] easy' twice over[.]" *Id.*

Justice Alito, joined by Chief Justice Roberts, and Justices Kennedy and Breyer, authored a dissenting opinion in *Jardines*. The dissenting opinion concluded the lead opinion decided the case "based on a putative rule of trespass law that is nowhere to be found in the annals of Anglo-American jurisprudence." *Id.* at 1420 (Alito, J., dissenting). It further found that both the lead and the concurring opinion were "also inconsistent with the reasonable-expectations-of-privacy test" set forth in *Katz*. *Id.* at 1421, 1424.

and the open fields is "as old as the common law," so too is the identity of home and what Blackstone called the "curtilage or homestall," for the "house protects and privileges all its branches and appurtenants." This area around the home is "intimately linked to the home, both physically and psychologically," and is where "privacy expectations are most heightened."

*Id.* at 1414-15 (citations omitted).

Notably, the lead opinion in *Jardines* did not address any indicia regarding the defendant's reasonable expectation of privacy in the front porch. *See id.*; *cf. Simmen*, 58 A.3d at 815-16; *Gibbs*, 981 A.2d at 280. Instead, it analyzed the officer's intrusion in terms of an express or implied license to trespass:

Since the officers' investigation took place in a constitutionally protected area, we turn to the question of whether it was accomplished through an unlicensed physical intrusion. While law enforcement officers need not "shield their eyes" when passing by the home "on public thoroughfares," an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas. In permitting, for example, visual observation of the home from "public navigable airspace," we were careful to note that it was done "in a physically nonintrusive manner." . . . "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave." As it is undisputed that the detectives had all four of their feet and all four of their companion's firmly planted on the constitutionally protected extension of [the defendant's] home, the only question is whether he had given his leave (even implicitly) for them to do so. He had not.

"A license may be implied from the habits of the country," notwithstanding the "strict rule of the English common law as to entry upon a close." We have accordingly recognized that "the knocker on the front door

is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters.[ ] Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do."

But introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do that. An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker. To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police. The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose. Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics. Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.

*Jardines*, 133 S. Ct. at 1415-16 (citations and footnotes omitted).

Mindful of the foregoing precepts, we review the trial court's following findings of fact and conclusions of law:

In this case, the Jeep Cherokee matched the description of the vehicle used in a series of robberies that had recently occurred. Officer Stucke had been told it was at the residence or near the residence of a known Iraqi male, and one of the perpetrators of the robberies was alleged to be a Middle Eastern male. The hood of the car was still

> warm from being driven, and there was a pile of personal items on the floor of the passenger side of the car. Under the totality of the circumstances determination, Officer Stucke had sufficient probable cause to conduct a search.

Trial Ct. Op. at 5-6. Thus, the court suggested a "search" first occurred when the officer entered the car. However, it did not address Appellee's claim that the officer engaged in a search when he "entered onto the private property, went to the vehicle in the driveway and finding the door unlocked, entered the vehicle." **See** Appellee's Omnibus Pre-Trial Mot. and Pet. for Habeas Corpus at 3-4; N.T. at 20.

The record reveals the following. Officer Stucke testified that on October 6, 2012, he received a report of a gunpoint robbery at Coach's Bar, which was located on the 3800 block of Elmwood Avenue. N.T. at 5. The report indicated a dark colored, older model, 1990's Jeep Cherokee was involved in the robbery. **Id.** The officer was aware that a similar vehicle was implicated in at least one robbery that occurred two days earlier. **Id.** He was also aware that the previous robbery involved "Iraqi males, or Arabic males."[12] **Id.** at 6.

After receiving the report, Officer Stucke and his partner patrolled the "immediate area," but then went to the 3600 block of Post Avenue based on

---

[12] The record does not indicate whether the October 6, 2012 report of the robbery at Coach's Bar contained a description of the perpetrators or their ethnicities.

information he obtained from the previous robbery.[13]  *Id.* at 5-6.  The officer's uncontradicted testimony was that after turning onto Post Avenue, "one house in, sitting in the driveway was a Cherokee that perfectly fit the description of the suspect vehicle in the robbery."  *Id.* at 7.  He further testified that the vehicle was parked "forwards" in the driveway.  *Id.* at 8.  The officer called for backup and relayed the plate number to his dispatcher.  *Id.* at 8.  He testified he "stood by until another unit arrived" and exited his vehicle after backup arrived.  *Id.*  Less than twenty minutes passed between the broadcast of the report and the officer's discovery of the vehicle.  *See id.* at 10 (indicating that no more than twenty minutes between receiving report and later checking vehicle for occupants).

Officer Stucke was not able to obtain registration information from his patrol vehicle's computer and his dispatch center "was not receiving returns from NCIC in regards to ownership of the vehicle."  N.T. at 10.  Further, the rear windows of the vehicle were "completely fogged over[,]" and the officer was unable to tell if the vehicle was occupied.  *Id.* at 8.  When a backup unit arrived, the officers "approached the vehicle from directly behind," to limit their visibility in case the vehicle was occupied.  *Id.*  Given the reports that the robbers were armed, the officers had their weapons drawn.  *Id.*

---

[13] Neither party adduced evidence regarding the distance between the scene of the robbery and Appellee's residence.

Officer Stucke stated he was not still able to see if the vehicle was occupied because the windows were "heavily fogged over" due to an earlier rain. *Id.* He approached the front passenger side door, and it was not until he reached the door that he found an unfogged portion. *Id.* at 9. He looked inside the vehicle using a flashlight and saw the car was unoccupied. *Id.* At the same time, however, he saw "a pile of an ID card and some bank cards" on the passenger side floorboard, where a passenger's left foot would be. *Id.* at 8, 10. He testified that area was "one of the first places I was looking" and "I saw [the ID and bank cards] clearly there." *Id.* at 10. He then went to the front of the vehicle, touched the hood, and felt a "good deal of heat coming from the vehicle, which indicated that it had been recently driven." *Id.* at 9.

Officer Stucke radioed his dispatcher to ask whether the NCIC information on the vehicle had been obtained. *Id.* He testified, "Basically at that point in time I decided we were directly next to the house. I felt that any moment somebody could look out and see us." *Id.* at 11. He went to the driver's side of the vehicle for cover, and then opened the unlocked driver's door. He testified, "I proceeded to go into the glove compartment of the vehicle, which was empty, in an attempt to locate a registration."[14] *Id.*

---

[14] On cross-examination, the officer testified, "[B]asically my reason for going inside the vehicle was to identify the owner of the vehicle." N.T. at 21. He reasoned, "at that point in time I was not sure if this vehicle was specifically involved in the robbery. I had a very strong inclination . . .

Finding no paperwork associated with the car, he "recalled the ID card and bank cards" on the passenger side floor board and seized them. *Id.* at 11. He read the name on the ID card and discovered it was the victim of the robbery earlier that night. *Id.* He radioed the officer investigating the robbery and confirmed the name of the victim. *Id.* at 11-12. The officer then "withdrew to a position of cover near the garage, and received a report that a door on the side of the garage was open and there was a light on inside. *Id.* at 12. He maintained security while additional units arrived to call the occupants out of the residence using a PA system. *Id.*

We conclude that the discovery of the suspect vehicle before officers entered the driveway did not constitute a search. *See Jardines*, 133 S. Ct. at 1415 (reiterating "law enforcement officers need not shield their eyes when passing by the home on public thoroughfares"). No privacy or property interests were intruded upon by the officer's actions when he observed the vehicle. *See id.* Similarly, the officer's observation of the vehicle's license plate and his decision to search computer records for information on the vehicle did not constitute a search. *See Commonwealth v. Bolton*, 831 A.2d 734, 737 (Pa. Super. 2003) (rejecting defendant's claim "charging officer must have some level of suspicion in

_____

[f]rom my prior experience on this job." *Id.* at 22. When asked whether "there [was] absolutely no doubt you were entering the vehicle to find possible evidence of crime[,]" the officer responded, "No. My reason for entering the vehicle was to find . . . who the registered owner of the vehicle was." *Id.*

order to run a license plate on the road through the NCIC computer," and noting, "we fail to see the need for some level of suspicion to check a license plate which is clearly in plain view.").

However, the officer's observations **after** he entered the driveway were critical to the trial court's determination that probable cause existed. **See** Trial Ct. Op. at 5-6. On this question, we are constrained to conclude there are gaps in the trial court's factual findings and legal conclusions. Specifically, the trial court made no determination on whether Appellee had a privacy interest in the driveway. **See Jardines**, 133 S. Ct. at 1415-16; **Simmen**, 58 A.3d at 815-16. Further, the current state of the record precludes this Court from determining whether (1) the officer conducted a search when entering the driveway; (2) the search was reasonable; and (3) if the search was unreasonable, whether the fruits obtained from the illegal search would taint the trial court's original probable cause determination. **See generally Commonwealth v. Brown**, 23 A.3d 544, 552 (Pa. Super. 2011) (*en banc*) (reiterating plain view exception to warrant requirement requires "(1) the police . . . observe the object from a lawful vantage-point; (2) the incriminating character of the object . . . be immediately apparent; and (3) the police . . . have a lawful right of access to the object."). Under these circumstances, it is prudent to permit the trial court in the first instance to find the relevant facts and render conclusions of law on these issues. The court may receive additional evidence or arguments from the

parties as it deems necessary and shall enter an order granting or denying suppression.

Order vacated. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/10/2015